Jon J. Eardley, SB#132577
30025 Alicia Parkway, #309
Laguna Niguel, CA 92677
Phone Number (949-434-4943)
Email Address (jon.eardley@aol.com)
In Pro Per



FILED
CLERK, U.S. DISTRICT COURT

9/29/21

CENTRAL DISTRICT OF CALIFORNIA
BY: ___KMH___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA—

SANTA ANA DIVISION

IN RE MATTER OF JON JAY EARDLEY

_____

STATE BAR OF CALIFORNIA,

    vs.

JON JAY EARDLEY,

        Respondent(s)

_____

) Case No.: 2:21-cv-07758 -SB-AFMx
) State Case Number(s):
) 14-N-2737; 11-C-16445;
) and as consolidated 08-O-10075
) NOTICE OF REMOVAL ET AL.
) [28 U.S.C Sec. 1331;
) Grable & Sons v. Darue
) Engineering, et al., 545 U.S. 308
) (2005); and U.S. Const., Art.I,
) Sec. 8, Clause 18.]
)

## INTRODUCTION

Respondent Jon J. Eardley hereby removes these various actions against him to the United States District Court, for the Central District of California, Santa Ana Division.  Under the unusual circumstances of this "case" the situation has so devolved that the matter has become entirely federal in its nature, and cannot without complete disregard for the interests of justice, remain in a state court, let alone the State Bar Court of the State of California.

1  Respondent contends that at this point in time the State Bar Court of
2  the State of California is in every sense and in effect a
3  racketeering enterprise pursuant to the terms of 18 U.S.C Sec. 1962
4  et seq.  Further, respondent hereby requests that a permanent
5  injunction issue against the operation of the State Bar Court of the
6  State of California pursuant to Chevron Corp. v. Donziger, 833 F.3d
7  74 (2016).  In view of the unresolved and un- investigated conspiracy
8  within the State Bar of California, and its so called "disciplinary
9  system" a permanent RICO injunction shutting down the State Bar Court
10 forever is appropriate and absolutely necessary herein.

11

12 THE STATE BAR OF CALIFORNIA IS A MULTI-FACETED CRIMINAL ENTERPRISE
13 THAT IS INIMICAL TO THE INTERESTS OF JUSTICE

14

15     The State bar court is a RICO enterprise that favors one group
16 of lawyers, over certain "target" individuals.  In the district court
17 case, the trial judge found numerous indictable acts that fell within
18 the RICO definition of racketeering activity in 18 U.S.C. Sec.
19 1961(1), see, e.g., Donziger, 974 F. Supp.2d at 576-99, 601,
20 including extortion in violation of 18 U.S.C. Sec. 1951 to deny a
21 person his property "induced by wrongful use of actual or threatened
22 force, violence, or fear, or under color of official right"; wire
23 fraud in violation of 18 U.S.C. Sec 1343 (communicating or
24 foreseeably causing communication "by means of wire…in interstate or
25 foreign commerce," of "writings," etc., in furtherance of a scheme or
26 artifice to defraud, or [to] obtain money or property" by way of
27 "false or fraudulent pretenses, representations, or promises");
28 obstruction of justice in violation of 18 U.S.C. Sec. 1503

1  ("corruptly...endeavoring to influence, obstruct, or impede, the due
2  administration of justice."

3      The memorandum prepared by State Bar Investigators and withheld
4  from Mr. Eardley for over five years makes it entirely clear that the
5  intent of the State Bar of California was and is to obstruct justice
6  under federal law, to continue to deny Brady evidence in a pending
7  state bar action for "disturbing the peace," and engaging in numerous
8  felonies against Mr. Eardley by virtue of their failure to provide
9  Brady evidence and to request appointment of counsel for the
10 respondent, as required by statute.  They have also refused to notify
11 the court where the entirely phony and fraudulent proceeding was
12 taken that is was an entirely scripted reality, designed to produce
13 an outcome pursuant to a sophisticated technological process in
14 cooperation with Bell Laboratories, the Intel Corporation, and its
15 wholly held subsidiary, COS Corporation.  It is also the belief of
16 the respondent that the disturbing the peace case was contrived
17 against him as part of an elaborate proceeding, in which the State
18 Bar of California participated.  This we will call for now "the
19 secret government project."

20     Their conduct parallels the Donziger case: "Donziger's conduct
21 with respect to the Fajardo Declaration was obstruction of justice,
22 plain and simple.  The declaration was drafted while the Stratus
23 Section 1782 proceeding was pending, as Donziger was acutely aware.
24 Its purpose—in Donziger's words—was to "prevent Stratus' role
25 relative to the Cabrera report from coming out."  Donziger was
26 involved in the communications as to what it would and would not say.
27 He knew that it was false or misleading.  His conduct was intended to
28 "impede...the due administration of justice," and it fell squarely

within the federal obstruction of justice statute." Donziger, 974
F.Supp.2d at 594 & n.1470.

     To this end the State Bar continues on, and engages in a highly
specialized form of defamation on its website.  Posted on its website
is an entirely untruthful, scurrilous, deceitful and fraudulent
"editorial" of respondent's professional career, maliciously designed
to defame respondent and to be entirely ant-competitive.  To date its
author or authors are unknown.  Judge Miles, formerly of the State
Bar Court, specifically stated on the record that he had no idea who
wrote it and that he specifically did not authorize it.  One of the
objectives of this proceeding is to identify the author or authors of
those defamatory statements and to bring those people to justice.

     In Donziger, the district court noted that "[n}umerous emails
were sent in furtherance of these schemes." Donziger, 974 F.Supp.2d
at 590 n. 1443.  "Much of the pressure and lobbying campaign was to
injure Chevron's reputation and impact its bottom line and its stock
price, a campaign micromanaged by Donziger that employed many U.S.
public relations advisors and lobbyists.  The State Bar's website is
every bit as pervasive in the conspiracy against Mr. Eardley.  The
objective clearly was and is to destroy his reputation and to defraud
him of his property through the utilization of violence and
oppression.  See Donziger, 974 F.Supp.2d at 574.

     The district court found that these acts constituted a pattern
of racketeering activity within the meaning of 18 U.S.C. Sec. 1961(5)
(requiring at least two acts of racketeering activity occurring
within 10 years of each other).  Donziger's acts of wire fraud,
bribery, obstruction of justice, and money laundering were committed
as part of an at-least "five-year effort to extort and defraud

Chevron' into paying a huge sum of money; and it was likely that the "demonstrated criminal activity…would continue into the future," expecially "in view of the defendants' failure thus far to achieve their goal." Donziger, 974 F.Supp.2d at 599.  Likewise, the State Bar has no intention of stopping its unmitigated anti-competitive, discriminatory, and highly abusive activity against the respondent.

The district court also permissibly found that Chevron's legal fees—those already expended to uncover Donziger's wrongful conduct and those being spent and soon-to-be spent to defend against enforcement proceedings—constituted further injury to Chevron.  See Donziger, 974 F.Supp.2d at 553, 638 "[L]egal fees may constitute RICO damages when they are proximately caused by a RICO violation." Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158, 1167 (2d Cir.), cert denied, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 334 (1993).

The Bar and its trustees have refused to provide respondent with information in its possession related to exculpatory evidence. Because of the heavy racketeering abuses committed against the respondent herein, he has been deliberately obstructed in his efforts to obtain additional evidence and discovery. Nevertheless, his property has been damaged, stolen or otherwise compromised.  Further, the new amendments related to prosecutorial abuse and misconduct under Brady require the prosecutor to notify all other related courts and to request on behalf of the respondent that counsel be appointed to represent him in those proceedings and to inform him of additional pertinent information.  This, they intentionally did not do and continue to refuse to do, even when presented with the letter of the law and its plain and definite requirements.

1    Equitable relief to private plaintiffs is consistent with
2  Congress's intent "to' encourage civil litigation to supplement
3  government efforts to deter and penalize the...prohibited practices.
4  The object of civil RICO is thus not merely to compensate victims but
5  to turn them into prosecutors, "private attorneys general," dedicated
6  to eliminating racketeering activity.'" NOW I, 267 F.3d at 698
7  (quoting Rotella v. Wood, 528 U.S. 549, 557, 120 S.CT. 1075, 145
8  L.Ed.2d 1047 (2000)); cf. Sedima, S.P.R.L. v. Imeex Co., 473 U.S.
9  479, 492 n.10, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)("indeed, if
10 Congress' liberal-construction mandate is to be applied anywhere, it
11 is in Sec. 1964, where RICO's remedial purposes are most evident."

12   "But Chevron's injury is in part its liability on an $8.646
13 billion judgment obtained through a pattern of racketeering activity;
14 that injury, affecting its net worth, is clear and definite.  The
15 inability to predict whether that entire amount will be collected
16 from Chevron does not affect the amount of the liability imposed."
17 See Donziger at 833 F.3d 74, 140 (2016).

18   At the same time that the lower courts were expansively
19 interpreting RICO's enterprise element to include purely criminal
20 associations in fact, another line of cases held that any
21 governmental agency, court, political office, or the like could also
22 serve as an "enterprise."

23   The following cases are illustrative: United States v. Freeman,
24 6 F.3d 586, 596-597 (9th Cir. 1993) (offices of California's 49th
25 Assembly District); United States v. Alonso, 740 F.2d 862, 870 (11th
26 Cir. 1984), cert. denied,469 U.S. 1166 (1985) (Homicide Section of
27 Dade County Public Safety Department); United States v. Ambrose, 740
28 F.2d 505, 512 (7th Cir. 1984), cert denied, 472 U.S. 1017 (1985)

(police department); United States v. Davis, 707 F.2d 880, 882-883 (6th Cir. 1983) (sheriff's office); United States v. Thompson, 685 F.2d 993 (6th Cir. 1982) (en banc) cert. denied, 459 U.S. 1072 (1983) (Tennessee Governor's Office); United States v. Angelilli, 660 F.2d 23 (2nd Cir. 1981), cert. denied, 455 U.S. 910, 945, 456 U.S. 939 (1982)(New York City Civil Court); United States v. Stratton, 649 F.2d 1066, 1072-1075 (5th Cir. 1981) (Florida's Third Judicial Circuit); United States v. Clark, 646 F.2d 1259, 1261-1267 (8th Cir. 1981) (office of county judge); United States v. Altomare, 625 F.2d 5, 7 (4th Cir. 1980)(office of prosecuting attorney); United States v. Vignola, 464 F.Supp. 1091 (E.D. Pa.), aff'd, 605 F.2d 1199 (3d Cir. 1979), cert. denied, 444 U.S. 1072 (1980)(traffic court).

Further, a governmental enterprise may itself be a "group of Individuals associated in fact" rather than a "legal entity" within section 1961(4). See United States v. Stratton, 649 F.2d 1066, 1075 (5th Cir. 1981); United States v. Baker, 617 F.2d 1060 (4th Cir. 1980).

It is quite clear that these defamations and multiple anti-competitive actions that have been directed at the respondent are entirely untrue and have been conducted under the auspices of the State Bar Court. The State Bar Court is clearly a racketeering enterprise that must be permanently enjoined, at least as to the respondent herein.

In United States v. Angellili, 660 F.2d 23 (2nd Cir.1981), cert. denied, 455 U.S. 910, 945, 456 U.S. 939 (1982) the court stated as follows:

"18 U.S.C. § 1961(4). The enterprise in whose activities defendants are alleged to have participated through a pattern of racketeering, is the New York City Civil Court. Defendants contend

that governmental units such as the Civil Court are not enterprises
within the meaning of RICO. We disagree.

"We begin with the language of the statute. On its face, the
definition of "enterprise" is quite broad. We see no sign of an
intention by Congress to exclude governmental units from its scope,
cf. United States v. Turkette, ___ U.S. ___, 101 S.Ct. 2524, 69
L.Ed.2d 246 (1981) (construing "enterprise" to include illegal as
well as legitimate ventures), and we note three pertinent aspects of
the definition that suggest an expansive rather than a restrictive
thrust. First, the term "enterprise" is defined to "include[ ]" the
entities listed thereafter. The use of the word "includes," rather
than a more restrictive term such as "means," "indicates that the
list is not exhaustive but merely illustrative." United States v.
Huber, 603 F.2d 387, 394 (2d Cir. 1979), cert. denied, 445 U.S. 927,
100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); United States v. Thevis, 474
F.Supp. 134, 138 (N.D.Ga.1979). See also 2A C. Sands, Sutherland on
Statutes and Statutory Construction 82 (4th ed. 1973) ("A term whose
statutory definition declares what it `includes' is more susceptible
to extension of meaning by construction than where the definition
declares what a term `means'"). Second, the use of the word "any"
indicates an intent to make the list all-inclusive. The inclusion of
"any individual," "any ... partnership," "any ... corporation," and
so forth, belies an intention to distinguish, for example, between
individuals having differing statuses, or between general and limited
partnerships, or between business and municipal corporations.
Finally, the word "entity" itself is hardly restrictive. It denotes
anything that exists. As modified by the word "legal," it suggests
that any being whose existence is recognized by law is within the

term "enterprise." We conclude that on its face the definition of an enterprise to "include[] any ... legal entity" is unambiguously broad, and that it does not exclude the Civil Court."

In United States v. Stratton, 649 F.2d 1066, 1072-1075 (5th Cir.1981), a judicial circuit was considered an enterprise:

"Appellants also suggest that since the Third Judicial Circuit is a government entity, it cannot constitute a RICO enterprise. We disagree. 18 U.S.C.A. § 1961(4) (West Supp.1981) defines "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."[11] It is well-settled that this definition is broad enough to include government departments and agencies such as Florida's Third Judicial Circuit. Cf. United States v. Bacheler, 611 F.2d 443 (3d Cir. 1979) (city Traffic Court); Bright, supra, 630 F.2d at 829 (sheriff's office); United States v. Brown, 555 F.2d 407 (5th Cir. 1977), cert. denied, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978) (city police department); United States v. Altomare, 625 F.2d 5 (4th Cir. 1980) (county prosecutor's office); 1075*1075 United States v. Karas, 624 F.2d 500 (4th Cir. 1980), cert. denied, ___ U.S. ___, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981) (county law enforcement office); United States v. Baker, 617 F.2d 1060 (4th Cir. 1980) (sheriff's department); United States v. Grzywacz, 603 F.2d 682 (7th Cir. 1979), cert. denied, 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980) (Gewin, J., sitting by designation) (city police department); United States v. Frumento, 563 F.2d 1083 (3rd Cir. 1977), cert. denied, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978) (State Bureau of Cigarette and Beverage Taxes); United States v. Dozier, 493 F.Supp. 554

NOTICE OF REMOVAL - 9

(M.D.La.1980) (State Department of Agriculture); United States v. Sisk, 476 F.Supp. 1061 (M.D.Tenn.1979) (state governor's office); United States v. Barber, 476 F.Supp. 182 (S.D. W.Va.1979) (State Alcohol Beverage Control Commissioner's Office); United States v. Vignola, 464 F.Supp. 1091 (E.D.Pa.), aff'd, 605 F.2d 1199 (3d Cir. 1979), cert. denied, 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980) (city Traffic Court)."

In United States v. Clark, 646 F.2d 1259, 1261-1267 (8th Cir. 1981), the court observed as follows:

"Because we have resolved the question whether a government agency or office can be a RICO "enterprise" on the basis of the language of the statute itself, we have no occasion to turn to other rules of statutory construction or the legislative history. Our conclusion is supported, however, by other parts of the RICO statute and, in part, by the legislative history, see note 14 infra.

"As discussed in United States v. Sisk, 476 F.Supp. 1061, 1062-63 (M.D.Tenn.1979) (Merritt, J., sitting by designation) (emphasis in original):

"The racketeering offenses named in the statute include many crimes, most of which are not necessarily related to governmental activity, as distinguished from private activity. But two of the crimes listed as racketeering offenses — bribery under state law and federal law and extortion under color of law (the Hobbs Act, 18 U.S.C. § 1951) — can only be committed in the context of governmental activity. At common law and under most statutes, bribery is limited to a payment given in exchange for the exercise of governmental power. Extortion under color of law is the use of governmental power to force an involuntary payment from another. By making bribery and

extortion RICO offenses, Congress must be said to have understood that these offenses would be committed by governmental officials as a part of their work. Since these offenses can only be committed in the context of the work of a governmental agency, Congress must be taken to have intended that a governmental agency could be one of the types of "enterprises," the affairs of which are conducted through a pattern of racketeering offenses. The connection between the named offenses or bribery and extortion and governmental work is too close to say that government work is not one of the kinds of activity that may constitute a RICO "enterprise."

"... There is nothing in the legislative history of the statute that suggests that Congress intended to exclude governmental agencies from "enterprise" coverage. There are broad references by the Congressional Sponsors that the purpose of the statute is to keep organized crime from corrupting legitimate businesses and "governmental institutions." This is inconclusive, however. [The] point is that the plain meaning of the definition of "enterprise" given in the statute and the inclusion of bribery and extortion as RICO offenses lead to the conclusion that a governmental agency is a RICO enterprise, and nothing in the legislative history indicates an intention to the contrary.

"We are led to the same conclusion if we look at the overall purpose of the statute and the harm it intends to counteract. The legislative history repeatedly says that the statute is designed to stop the "infiltration" of legitimate enterprises by persons who use the enterprise for the commission of certain crimes. This harm can occur just as easily in a police department, a licensing bureau or other governmental agency, as in a company or union. The harm to be

counteracted is equally applicable to both public and private institutions.

"See also <u>United States v. Frumento</u>, supra, 563 F.2d at 1090-92; <u>United States v. Barber</u>, supra, 476 F.Supp. at 184-90; <u>United States v. Vignola</u>, <u>supra</u>, 464 F.Supp. at 1095-97."

In <u>United States v. Altomare</u>, 625 F.2d 5, 7 (4th Cir. 1980), the court held that RICO applied to the office of prosecuting attorney:

"As a result of his alleged involvement in illegal gambling activities the Prosecuting Attorney of Hancock County, West Virginia, Robert G. Altomare, was indicted April 5, 1979, on three counts for violating, and conspiring to violate, in 1977 through 1979, the Racketeer Influenced and Corrupt Organizations Act (RICO) and for violating, on January 31, 1979, the Obstruction of Justice Act, by endeavoring to induce a witness before a grand jury to testify falsely. At the same time he also stood indicted, as of February 6, 1979, for conspiring during 1979 to obstruct the enforcement of the criminal laws of West Virginia with the intent to facilitate an illegal gambling business. Convictions ensued May 2, 1979, upon all of the charges and Altomare appeals.

In his brief, appellant makes 11 points against the judgments. His fundamental defense is that the office of Prosecuting Attorney of Hancock County is not an "enterprise" within the condemnation of RICO. We reject such a narrow interpretation of RICO and hold that a public entity, such as the prosecutor's office here, may be an "enterprise" within the coverage of the statute. Accord United States v. Baker, 617 F.2d 1060 (4th Cir. 1980). Concurring in the conclusion reached by other courts in all but one of the previous decisions touching on this question, we find nothing in the clear language of

the statute nor in the legislative history to suggest that Congress
intended entirely to exempt such entities from the sweep of this
legislation.

"Altomare next asserts that the County Prosecuting Attorney's
office did not have the requisite nexus with interstate commerce to
be within the jurisdiction of RICO. Because of the very nature of the
powers and duties conferred upon it, however, that office necessarily
is an institution "engaged in, or the activities of which affect,
interstate or foreign commerce." 18 U.S.C. § 1962(c). The record
reveals that interstate telephone calls regularly were placed from
the prosecutor's office, that certain of the supplies and materials
purchased and used by the prosecutor's office had their origins
outside of West Virginia, and that persons who were not citizens or
residents of the State were involved in investigations and litigation
conducted by the prosecutor's office. These contacts provide a
sufficient basis for invoking RICO's jurisdiction over the
prosecuting attorney's office. See Perez v. United States, 402 U.S.
146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); United States v.
Campanala, 518 F.2d 352, 364 (9th Cir. 1975), cert. denied, 423 U.S.
1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). RICO, or Title IX of the
1970 Act, is aimed at removing racketeering influences from
enterprises engaged in, or the activities of which affect, interstate
commerce. Through RICO, Congress hoped to reduce the burden placed
upon interstate commerce by racketeers, and, to that end, Congress
has given "enterprise" the broad definition previously quoted. This
definition makes no exception for public entities such as the
judiciary, nor do we find any basis in the legislative history for
implying one. Indeed, in adopting the 1970 Act, Congress expressed a

particular concern for the subversion and corruption of "our democratic processes" and the undermining of the "general welfare of the Nation and its citizens" by "organized crime". Congressional Statement of Findings and Purpose, Pub.L. No. 91-452, 84 Stat. 923."

Congress has specifically directed that RICO be "liberally construed to effectuate its remedial purposes . . ." Pub.L. No. 91-452, § 904, and the courts have recognized and given effect to that mandate. They have been in near-unanimity in rejecting challenges to the characterization of a particular entity as an "enterprise", and have held, for example, that the Pennsylvania Bureau of Cigarette and Beverage Taxes, the Pennsylvania State Senate, a municipal police department, and the Philadelphia Redevelopment Authority are all enterprises within the meaning of RICO.

In United States v. Vignola, 464 F. Supp. 1091 (E.D. Pa.), aff'd, 605 F.2d 1199 (3d Cir. 1979), cert. denied, 444 U.S. 1072 (1980) the court specifically held that RICO's enterprise element applies to the judiciary:

"RICO, or Title IX of the 1970 Act, is aimed at removing racketeering influences from enterprises engaged in, or the activities of which affect, interstate commerce. Through RICO, Congress hoped to reduce the burden placed upon interstate commerce by racketeers, and, to that end, Congress has given "enterprise" the broad definition previously quoted. This definition makes no exception for public entities such as the judiciary, nor do we find any basis in the legislative history for implying one. Indeed, in adopting the 1970 Act, Congress expressed a particular concern for the subversion and corruption of "our democratic processes" and the undermining of the "general welfare of the Nation and its citizens"

by "organized crime". Congressional Statement of Findings and
Purpose, Pub.L. No. 91-452, 84 Stat. 923.

Congress has specifically directed that RICO be "liberally
construed to effectuate its remedial purposes . . ." Pub.L. No. 91-
452, § 904, and the courts have recognized and given effect to that
mandate. They have been in near-unanimity in rejecting challenges to
the characterization of a particular entity as an "enterprise", and
have held, for example, that the Pennsylvania Bureau of Cigarette and
Beverage Taxes, the Pennsylvania State Senate, a municipal police
department, and the Philadelphia Redevelopment Authority are all
enterprises within the meaning of RICO.

The issue of whether a foreign corporation may be alleged as the
enterprise arose in one of the earliest RICO cases, United States v.
Parness, 503 F.2d 430 (2d Cir. 1974), cert. denied, 419 U.S. 1105
(1975). Parness involved a fraudulent scheme by which the defendant
gained control of a Carribean hotel and casino by withholding payment
on debts owed to the hotel. His failure to pay forced the victim to
borrow from third parties to cover the hotel's expenses. Parness
then loaned funds to the hotel through strawmen to pay its third
party obligations. Finally, the strawmen foreclosed, leaving Parness
in control of the enterprise. He was found guilty of violating
section 1962 (b). There has been no litigation on this issue of
foreign corporations constituting racketeering enterprises since
Parness.

It is a well known fact that during the times of Girardi's
involvement with the State Bar of California he was the owner of the
Bicycle Casino in Commerce. Further, there is absolutely no evidence
to suggest that Girardi is still not significantly involved in the

operation, if not the complete control of the State Bar of California. It would be naïve to entertain any other conclusion.

Furthermore, former state senator and State Bar Chief Prosecutor Joe Dunn has consistently stated that certain individuals who were members of the bar were invidiously targeted by the State Bar of California and prosecuted as a part of schemes that were and are anti-competitive, at the least. However, it has never been ascertained who these people are and the extant circumstances of these malicious and corrupt prosecutions, or any of the circumstances surrounding such racketeering activity.

"We also reject Barbara's claim that the evidence was insufficient to support her conviction as an aider and abettor. Her active involvement in virtually every aspect of Parness' scheme to acquire Hotel Corp. and the subsequent cover-up warranted the jury in finding that she had associated herself with the venture and had sought to make it succeed. Nye & Nissen Corp. v. United States, 336 U.S. 613, 619 (1949), quoting in part from United States v. Peoni, 100 F.2d 401, 402 (2 Cir.1938) (L. Hand, J.); United States v. Manna, 353 F.2d 191, 192 (2 Cir.1965), cert. denied, 384 U.S. 975 (1966)." Parness at 437-438."

The activities and associations described in Parness are eerily reminiscent of the associations between the State Bar of California, Tom Girardi and spouse, Joe Dunn, Tom Layton, Howard Miller, The Real Housewives of Beverly Hills, The Bravo Network, and its parent corporation, NBC Universal, Inc., and a mysterious foreign corporation known as Bravo Entertainment.

The Parness court further observed as follows:

"It is not an overstatement to characterize the evidence of Barbara's participation as overwhelming. She purchased the cashier's checks used in connection with the Goberman loan. She stated to the person who accompanied her to the bank on February 4 that she was arranging for the takeover of a hotel. She allowed her name to be used in the loan agreement. She participated in executing on April 3 the bogus documents by which Goberman was formally divested of his stock. She acquiesced in the transfer without consideration of "her" interest in Hotel Corp. to Aliter.

"Moreover, she testified falsely before the grand jury that Levrey had furnished $150,000 in cash to be used for the Goberman loan. It is axiomatic that exculpatory statements, when shown to be false, are circumstantial evidence of guilty consciousness and have independent probative force. United States v. Lacey, 459 F.2d 86, 89 (2 Cir.), cert. denied, 409 U.S. 860 (1972); United States v. DeAlesandro, 361 F.2d 694, 697-98 (2 Cir.), cert. denied, 385 U.S. 842 (1966). This rule has especially compelling application here, for Barbara's false testimony tended not only to conceal her own participation in the transfer of the stolen funds but furthered the cover-up initiated by her husband." Parness at 437-438.

The use of shills and stooges to acquire ownership interests at the Commerce Casino, wherein Girardi was the majority interest holder, has been specifically noted in public statements filed with the Gambling Control Commission in Sacramento.  It is worth noting that the testifying witness had obtained over $500,000.00 in settlement proceeds from the Girardi law firm which she claimed had been embezzled by individuals connected to the Casino.  Further it was her contention that the murders of her former boss, Dick Traweek

in October of 2009 and attorney Jeffrey Tidus in December of 2009 were in some way connected.  Jeffrey Tidus, a former State Bar Governor and Commerce Casino owner, had been murdered execution style. Just hours before his execution, three executives of New Century Financial, his former client, had been accused of fraud. The case has never been solved. <u>See</u> Testimony of Leslie Stevenson before California Gambling Commission, March 24, 2011.

Girardi's interests in the Bicycle Casino(i.e. "Commerce Casino") parallel the interests of the United States Government in that "project." Finally, in 1996, the situation became so embarrassing for the CIA that the United States had to sell its interests in the Commerce Casino, however, not without some difficulty and the brokerage of Girardi himself.  It is interesting to note that the government acquired its interests by virtue of the RICO laws.

"The government acquired its interest in the Bicycle Club pursuant to 18 U.S.C. § 1963 as a result of the conviction of Benjamin Barry Kramer and Michael Gilbert for violation of the Racketeer Influence and Corrupt Organizations Act ("RICO"). The Bicycle Club is operated by a joint venture between Park Place Associates, Ltd. ("PPA") and LCP Associates, Ltd. ("LCP"). At the conclusion of ancillary forfeiture proceedings in this matter, the court determined that LCP was a mere nominee for BTR, a partnership between Benjamin Barry Kramer, Randy Thomas Lanier, George Paul Brock and Eugene Albert Fischer and that Kramer and his associates established the Bicycle Club for purposes of money laundering. United States v. Kramer, 807 F.Supp. 707 (S.D.Fla.1991)." <u>See</u> <u>United States v. Kramer</u>, 957 F. Supp. 223 (1997).

However, in that very case, what was not made clear to the court was the involvement of Girardi and the Girardi and Keese law firm in the operation and ownership of the Commerce Casino.

The court further points out:

"The meeting was fairly short on the evening of the 17th. Jack Kramer revealed the contents of the conversation to be a discussion between him and Sam as to the money flow, which is reflected on Government's Exhibit 182. The next morning Sam prepared the chart (Govt.Ex. 183) and, referring to Hardie, Lyon, Pierson and Coyne, said: "these are your straw people. These are lily-white people who will be approved by the Gambling Commission:" These are "the names.""  United States v. Kramer, 957 F. Supp. At 228, fn. 3.

Clearly, the use of "strawmen" is indicative of the circumstances in Parness and that surrounding the Commerce Casino. Further, the use of unpaid debts factors heavily into the acquisition of ownership interests in both the casino in Parness and the Commerce Casino. What is interesting, however, is the existence of a foreign corporation with respect to the application of the RICO laws in both circumstances. That corporation is engaged in a highly sophisticated operation that has likely penetrated NBC/Universal and whose activities are related to violations of 18 U.S.C. Sec. 831 and 18 U.S.C. Sec 1961.

Circumstantial evidence is clearly available to link the State Bar of California to the operations of the Commerce Casino for a period in excess of thirty years, and as part of the "secret government project" involving the United States by and through the auspices of the Central Intelligence Agency.

Part of this "project" involves the laundering of money pursuant to schedule. Having drug money laundered at the Commerce Casino nets the Casino approximately $100,000.00 per million dollars exchanged.

"As this court noted in United States v. Elliott, 571 F.2d 880, 898 (5th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), proof of association with a RICO enterprise may depend wholly on circumstantial evidence. The record in this case contains such evidence. Although Thevis had purportedly sold his interest in the pornography business to his secretary, Laverne Bowden, for $16 million dollars, the note securing the sale was always in default. Thevis, therefore, could foreclose at any time and regain his interest in the business. Rodney Glen Smith, a cellmate of Thevis in 1977, testified that despite the "sale," Thevis stated he still "controlled" his pornography empire; given the terms of the "sale" and the fact Thevis had contacted Ms. Bowden after his escape from jail in 1978, one could infer that Thevis' interest in the success of the pornography enterprise continued until the Underhill murder. The murder itself, moreover, neatly advanced Thevis' interests in the enterprise. The original indictment in the case sought forfeiture of all the assets of Global and Fidelity under RICO forfeiture provisions. The Underhill murder was designed to prevent the government's key witness from testifying at trial, thus imperiling the government's entire RICO case and preventing both RICO criminal convictions and forfeiture. The murder, therefore, protected the integrity of the enterprise. Keeping the enterprise together was inextricably tied to furthering its business; hence the Underhill murder was a proper predicate act under § 1962. See United States v. Welch, 656 F.2d 1039, 1060-62 (5th Cir. 1981) (predicate acts only

1  required to have sufficient nexus with enterprise to be properly

2  charged under RICO).”  See <u>United States v. Thevis</u>, 665 F.2d 616, 625

3  (5th Cir. 1982).

4       The State Bar of California has discriminated against the

5  respondent because of the type of work he has done as a lawyer,

6  receiving a commendation from Attorney General Brown in the same case

7  for which he was “disciplined” by this racketeering organization, and

8  for reasons that date back to the time when he was a small child in

9  the Commonwealth of Pennsylvania, where he assisted the Pennsylvania

10 Attorney General's Office and its Bureau of Narcotics, in the real

11 America. The State Bar of California has gone so far as to

12 participate in a scheme against the respondent to have him prosecuted

13 for “disturbing the peace,” throwing him in jail where he was

14 brutally tortured by Riverside County Sheriffs deputies while

15 suffering from a 99% blockage in his coronary artery, and having his

16 children kidnapped and trafficked, all intentionally in violation of

17 the racketeering laws of the united states.

18      The action against the respondent constitutes blatant

19 racketeering activity.  To support a conviction under § 1028(a)(2),

20 the Government need only prove that the State Bar and its operatives

21 "knowingly transfer[ed] an identification document or a false

22 identification document knowing that such document was stolen or

23 produced without lawful authority." 18 U.S.C. § 1028(a)(2). Section

24 1028(d)(4) defines the term "false identification document" as "a

25 document of a type intended or commonly accepted for the purposes of

26 identification of individuals that ... appears to be issued by or

27 under the authority of the United States Government, a State, [or] a

28 political subdivision of a State...." 18 U.S.C. § 1028(d)(4)(B).

Also, the transfer had to be in or affecting interstate commerce. 18 U.S.C. § 1028(c)(3)(A).

Herein, there is no question they knew what they were doing and how it would harm the respondent and his children. Still, to this day, knowing what they have done, they refuse to act because they assume they will continue to be protected by a larger syndicate that purports to be a part of "the secret government project" that exists within the military industrial complex and of course, the Central Intelligence Agency.

The State Bar of California, and the County of Riverside knowingly and willingly participated in this stunt against the respondent and his children, knowing that the State Bar of California had a memorandum in its possession that completely exonerated the respondent of any wrongdoing.  The State Bar of California was required to present the information to the Riverside County court and to demand that counsel be appointed. It intentionally did not do so. Such a failure under state law constitutes a felony by State Bar Prosecutors. This memorandum was prepared and intentionally suppressed in violation of <u>Brady</u>, and while knowing they were maintaining pending false proceedings and covering up the fraud and criminality of all of their so-called "disciplinary" proceedings.  It is worth noting that former State Bar Chief Trial Counsel, who was found to have intentionally misled the bar, is currently in the employ of the University of California, where the "secret government project" has its nefarious origins involving violations of 18 U.S.C Sec. 794, 18 U.S.C. Sec. 1831, 18 U.S.C. sec 1959, and 18 U.S.C. Sec. 2381., et al.

1   One purpose in RICO is an "exercise in public education and
2   ritual denunciation of criminal activity." Lynch, RICO: The Crime of
3   Being a Criminal (pts. 1-4), 87 Colum.L.Rev. 661, 969 (1987).   In
4   this case the so-called mission of the State Bar is to protect the
5   public. However, if anything, the state bar has endangered the public
6   by engaging in behavior that is antithetical to moral decency and the
7   rule of law.   Further, it has engaged in anti-competitive conduct
8   that is in flagrant opposition to the Supreme Court's decision in
9   North Carolina State Board of Dental Examiners v. FTC, 574 U.S. 494,
10  135 S. Ct. 1101, 191 L. Ed. 2d 35 (2015).

11      All of these actions were designed to cause the suspension of
12  the respondent from practice in March of 2011.   Respondent was
13  divested of his position as counsel in the multi-district litigation
14  that he started, In Polycarbonate Plastics Products Liability
15  Litigation.   What the Bar does not tell the public in its defamatory
16  web site is that it was the respondent who started the entire BPA
17  Free movement. The case was reviewed by the United States Senate, and
18  was later approved of by the FDA.

19      Once the BPA case was removed from the complex litigation
20  department of the Los Angeles Superior Court, it was Tom Girardi who
21  controlled all aspects of the case.   It was at that time that Howard
22  Miller, Girardi's partner, became president of the State Bar of
23  California.   It is worth noting that several articles in the Los
24  Angeles Times and other media outlets have repeated that under the
25  reign of Howard Miller all of Girardi's problems with the Bar
26  effectively ended.   Conversely, it was during that time and shortly
27  before the settlement in the BPA litigation that respondent was
28  suspended from practice. Respondent could not participate in the

settlement negotiations with defendants, and surely, as Girardi and the rest of the steering committee knew, would have never agreed to the terms of the settlement.  Nevertheless, in violation of California Law, Respondent's name was later signed electronically and without his consent.

The State Bar of California participated in that fraud, which prevented the respondent from further protecting the children of the world.  Further the racketeering activity of the state bar of California constitutes a fundamental abuse of human rights, and a crime against humanity in violation of international law.

## THE ENTIRE STATE BAR ACT IS UNCONSTITUTIONAL

The respondent herein will be moving for an order declaring the entire State Bar Act unconstitutional pursuant to Obergefell v. Hodges, 576 U.S. 644, 135 S.Ct 1732, 192 L.Ed 2d 609 (2015), a decision that either coincidentally or by the hand of God, was written by Justice Anthony Kennedy, the close friend and confidant of Tom Girardi.

"Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law." The fundamental liberties protected by this Clause include most of the rights enumerated in the Bill of Rights. See Duncan v. Louisiana, 391 U. S. 145, 147-149 (1968). In addition these liberties extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs. See, e.g., Eisenstadt v. Baird,

405 U. S. 438, 453 (1972); Griswold v. Connecticut, 381 U. S. 479, 484-486 (1965).

"The identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution. That responsibility, however, "has not been reduced to any formula." Poe v. Ullman, 367 U. S. 497, 542 (1961) (Harlan, J., dissenting). Rather, it requires courts to exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect. See ibid. That process is guided by many of the same considerations relevant to analysis of other constitutional provisions that set forth broad principles rather than specific requirements. History and tradition guide and discipline this inquiry but do not set its outer boundaries. See Lawrence, supra, at 572. That method respects our history and learns from it without allowing the past alone to rule the present." Hodges, 576 U.S. at 647.

The fact of the matter is that history and tradition no longer have a role in constitutional analysis, particularly as to the licensing of lawyers. For the most part the practice of law consists of making intellectual arguments and submitting them to a court, an arm of the state or federal government.  The state has no interest in regulating this type of speech. In any other context, it would be barred by First Amendment jurisprudence.  The fact that a state has anything to do with the licensing of lawyers or preventing lawyers from practicing law is essentially the regulation of protected speech.

"The Court has applied strict scrutiny to content-based laws regulating the noncommercial speech of lawyers, see Reed, supra, at

___, 135 S.Ct., at 2228, professional fundraisers, see Riley, supra, at 798, 108 S.Ct. 2667, and organizations providing specialized advice on international law, see Holder v. Humanitarian Law Project, 561 U.S. 1, 27-28, 130 S.Ct. 2705, 177 L.Ed.2d 355. And it has stressed the danger of content-based regulations "in the fields of medicine and public health, where information can save lives." Sorrell v. IMS Health Inc., 564 U.S. 552, 566, 131 S.Ct. 2653, 180 L.Ed.2d 544. Such dangers are also present in the context of professional speech, where content-based regulation poses the same "risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information," Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 641, 114 S.Ct. 2445, 129 L.Ed.2d 497. When the government polices the content of professional speech, it can fail to "`preserve an uninhibited marketplace of ideas in which truth will ultimately prevail.'" McCullen v. Coakley, 573 U.S. ___, ___ _ ___, 134 S.Ct. 2518, 2529, 189 L.Ed.2d 502. Professional speech is also a difficult category to define with precision. See Brown v. Entertainment Merchants Assn., 564 U.S. 786, 791, 131 S.Ct. 2729, 180 L.Ed.2d 708. If States could choose the protection that speech receives simply by requiring a license, they would have a powerful tool to impose "invidious discrimination of disfavored subjects." Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 423, n. 19, 113 S.Ct. 1505, 123 L.Ed.2d 99. Pp. 2373-2375.

"The unlicensed notice unduly burdens protected speech. It is unnecessary to decide whether Zauderer's standard applies here, for even under Zauderer, a disclosure requirement cannot be "unjustified or unduly burdensome." 471 U.S., at 651, 105 S.Ct. 2265. Disclosures

must remedy a harm that is "potentially real not purely
hypothetical," Ibanez v. Florida Dept. of Business and Professional
Regulation, Bd. of Accountancy, 512 U.S. 136, 146, 114 S.Ct. 2084,
129 L.Ed.2d 118, and can extend "no broader than reasonably
necessary," In re R.M. J., 455 U.S. 191, 203, 102 S.Ct. 929, 71
L.Ed.2d 64. California has not demonstrated any justification for the
unlicensed notice that is more than "purely hypothetical." The only
justification put forward by the state legislature was ensuring that
pregnant women know when they are receiving medical care from
licensed professionals, but California denied that the justification
for the law was that women did not know what kind of facility they
are entering when they go to a crisis pregnancy center. Even if the
State had presented a nonhypothetical justification, the FACT Act
unduly burdens protected speech. It imposes a government-scripted,
speaker-based disclosure requirement that is wholly disconnected from
the State's informational interest. It requires covered facilities to
post California's precise notice, no matter what the facilities say
on site or in their advertisements. And it covers a curiously narrow
subset of speakers: those that primarily provide pregnancy-related
services, but not those that provide, e.g., nonprescription birth
control. Such speaker-based laws run the risk that "the State has
left unburdened those speakers whose messages are in accord with its
own views." Sorrell, supra, at 580, 131 S.Ct. 2653. For these
reasons, the unlicensed notice does not satisfy Zauderer, assuming
that standard applies. Pp. 2376-2378." See National Institute of
Family and Life Advocates, dba NILFA v. Becerra, ___U.S.___, 138
S.Ct. 236, ___L.Ed___ (2018).

The Fifth Circuit in <u>Vizaline, LLC v. Tracy</u>, 949 F.3d 927, 932 (5th Cir. 2020), has taken the principle much further.

"In dismissing Vizaline's free speech challenge to Mississippi's surveyor-licensing requirements, the district court erred in distinguishing NIFLA. The court distinguished NIFLA on the ground that it did not involve occupational-licensing restrictions, i.e., "restrictions on who may engage in a profession." In the court's view, occupational-licensing restrictions—like Mississippi's surveyor regulations—restrict only conduct, not speech. The court therefore held that Mississippi's regulations only "incidentally infringed upon" Vizaline's speech because they merely "determin[e] who may engage in certain speech." The court therefore applied no First Amendment scrutiny to the surveyor-licensing requirements.

"This analysis runs afoul of <u>NIFLA</u>. By discarding the professional speech doctrine, <u>NIFLA</u> rejected the proposition that First Amendment protection turns on whether the challenged regulation is part of an occupational-licensing scheme. <u>See</u> 138 S. Ct. at 2375. The Court overruled circuit decisions that had exempted regulations from First Amendment scrutiny merely because they arose from "generally applicable licensing provisions affecting those who practice the profession." <u>Moore-King</u>, 708 F.3d at 569. In other words, application of the now-discarded professional speech doctrine often went hand-in-hand with occupational-licensing regimes. <u>See</u>, e.g., <u>id.</u> at 569-70 (applying doctrine to a "licensing and regulatory regime for fortune tellers"); Bowman, 860 F.2d at 603 (addressing statute governing "licensing and regulating the profession of accountancy in Virginia"). Accordingly, the Court warned that the doctrine gave "the States unfettered power to reduce a group's First

Amendment rights by simply imposing a licensing requirement." 138 S. Ct. at 2375 (emphasis added); see also id. (observing that courts applying the professional speech doctrine had held a "profession" means simply that the activity "involves personalized services and requires a professional license from the State" (emphasis added)). The Court thus made clear that First Amendment scrutiny does not turn on whether censored speakers are professionals, licensed or not. Instead, NIFLA reoriented courts toward the traditional taxonomy that "draw[s] the line between speech and conduct." Id. at 2373; see also, e.g., Sorrell, 564 U.S. at 567, 131 S.Ct. 2653 (explaining that "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech" (citing Rumsfeld v. Forum for Acad. and Inst. Rights, Inc., 547 U.S. 47, 62, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006); R.A.V. v. St. Paul, 505 U.S. 377, 385, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949)))." See, Vizaline v. Tracy, 949 F.3d 927, 932 (5th Cir. 2020).

The State Bar Act in its entirety consists of enumerated provisions that deny the right to practice law or deny the granting of a license.  In all cases the state bar is micro-managing speech in a manner that is in violation of Hodges.  The fundamental rights herein protected are those enumerated in the Bill of Rights, such as freedom of speech, but also the right to practice law in a manner that is central to individual dignity and autonomy and includes intimate choices that define personal identity and beliefs.  The State Bar Act, as written, denies the respondent the right to practice law because it seeks to control all protected speech under

the "professional speech doctrine." Thus, the entire State Bar Act must be struck down.

## THE NECESSARY AND PROPER CLAUSE PROVIDES A DERIVATIVE FORM OF RELIEF HEREIN

Respondent contemplates a case of First Impression pursuant to a derivative right that lies within the Necessary and Proper Clause. The state bar has engaged in racketeering activities against the respondent for a period of ten years or more.  Further the state bar court is clearly a racketeering enterprise pursuant to 18 U.S.C. Sec 1961(4).

"The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, "private attorneys general," dedicated to eliminating racketeering activity. Id., at 187 (citing Malley-Duff, 483 U. S., at 151) (civil RICO specifically has a "further purpose [of] encouraging potential private plaintiffs diligently to investigate"). The provision for treble damages is accordingly justified by the expected benefit of suppressing racketeering activity, an object pursued the sooner the better. It would, accordingly, be strange to provide an unusually long basic limitations period that could only have the effect of postponing whatever public benefit civil RICO might realize." See Rotella v. Wood, 528 U.S. 549, 557-558, 120 S.CT. 1075, 145 L.Ed 2d 1047 (2000).

The state bar gambled that it could get away with a stunt like this, engaging in the most twisted perversity and criminality imaginable against this respondent for over a decade, and it still continues on with no sign of ending.  The respondent has been denied equal protection of the law and due process of law.  The respondent

has no right to a jury trial pursuant to the Sixth and Seventh Amendments, while they have used this racketeering enterprise to destroy his life outside of the context of his status as a lawyer. This court should know that one objective of the state bar has been to prevent Mr. Eardley from holding federal office or receiving a federal appointment.

Under these unusual circumstances, the state bar and its functionaries should be denied the benefit of a jury trial, just as respondent has been denied such right, while enduring the burden of being subject to a court for which the rest of the society is not subject.  In this context, the state bar should be subjected to an expedited proceeding that is consistent with the fulfilment of Congress' objectives. Further the functionaries of the state bar should be subject to a criminal penalty without the benefit of a jury trial and on an expedited basis as well.  See ex parte Yarbrough, 110 U.S. 651 (1884).

In this case, damages are not based upon a presentation that is according to proof.  They are instead based upon the respondent's submission in the form of a "suggestion," and reviewed by the court for their "reasonableness."

The respondent hereby submits the following preliminary suggestion(s):

That respondent's children are to be handed over to him at once;

Actual damages to the respondent are to be calculated per year times eleven;

Punative damages in an amount of ten times the actual damages per annum;

## PUNATIVE CORRECTIVE ADVERTISING WILL BE REQUIRED HEREIN

Further respondent will submit to the court for its approval a plan for a new species of "punative" corrective advertising, directed at curing the anti-competitive and seditious abuses herein leveled against the respondent. See Warner Lambert v. FTC, 562 F.2d 749 (D. C. Cir 1977); Novartis v. FTC, 223 F. 3d785 (2000).

"This principle, in its application to the Constitution of the United States, more than to almost any other writing, is a necessity, by reason of the inherent inability to put into words all derivative powers — a difficulty which the instrument itself recognizes by conferring on Congress the authority to pass all laws necessary and proper to carry into execution the powers expressly granted and all other powers vested in the government or any branch of it by the Constitution. Article I., sec. 8, clause 18." See ex parte Yarbrough, 110 U.S. 651, 658 (1884).

## GRABLE REQUIRES REMOVAL HEREIN DUE TO THE OBVIOUS FEDERAL INTEREST HEREIN

"The classic example is Smith v. Kansas City Title & Trust Co., 255 U. S. 180 (1921), a suit by a shareholder claiming that the defendant corporation could not lawfully buy certain bonds of the National Government because their issuance was unconstitutional. Although Missouri law provided the cause of action, the Court

recognized federal-question jurisdiction because the principal issue in the case was the federal constitutionality of the bond issue. Smith thus held, in a somewhat generous statement of the scope of the doctrine, that a state-law claim could give rise to federal-question jurisdiction so long as it "appears from the [complaint] that the right to relief depends upon the construction or application of [federal law]." Id., at 199.

"The Smith statement has been subject to some trimming to fit earlier and later cases recognizing the vitality of the basic doctrine, but shying away from the expansive view that mere need to apply federal law in a state-law claim will suffice to open the "arising under" door. As early as 1912, this Court had confined federal-question jurisdiction over state-law claims to those that "really and substantially involv[e] a dispute or controversy respecting the validity, construction or effect of [federal] law." Shulthis v. McDougal, 225 U. S. 561, 569. This limitation was the ancestor of Justice Cardozo's later explanation that a request to exercise federal-question jurisdiction over a state action calls for a "common-sense accommodation of judgment to [the] kaleidoscopic situations" that present a federal issue, in "a selective process which picks the substantial causes out of the web and lays the other ones aside." Gully v. First Nat. Bank in Meridian, 299 U. S. 109, 117-118 (1936). It has in fact become a constant refrain in such cases that federal jurisdiction demands not only a contested federal issue, but a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum. E. g., Chicago v. International College of Surgeons, 522 U. S. 156, 164 (1997); Merrell Dow, supra, at 814, and n. 12; Franchise Tax Bd.

of Cal. v. Construction Laborers Vacation Trust for Southern Cal.,
463 U. S. 1, 28 (1983)."

    Herein, it has taken years for the ugly head of state bar anti-competition to become cognizably visible within the context of federal law.  Now, however, that has resolutely become the case, and this matter may no longer languish within the bowels of state bar court corruption and outright criminality.  Here, removal pursuant to Grable is appropriate, and is further consistent with the constitutional mandate of the Necessary and Proper Clause and all implied rights that derive therefrom.

**CONCLUSION**

    For the foregoing reasons, respondent Jon J. Eardley hereby removes each and every matter pertaining to himself from the State Bar Court.  Further, respondent hereby demands the additional relief requested herein.

Dated this 29st day of September, 2021

Respectfully submitted,

Jon J. Eardley

THE STATE BAR OF CALIFORNIA
OFFICE OF THE CHIEF TRIAL COUNSEL
CHARLES A. MURRAY, No. 146069
1149 South Hill Street
Los Angeles, California 90015-2299
Telephone: (213) 765-1000



MAY 3 1 2013 JG

IN THE STATE BAR COURT OF THE STATE BAR OF CALIFORNIA

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

| | |
|---|---|
| IN THE MATTER OF THE CONVICTION OF: | ) Case No. 11-C-16445 |
| | ) |
| | ) Transmittal of Records of Conviction of Attorney (Bus. & Prof. |
| **JON JAY EARDLEY ,** | ) Code §§ 6101-6102; Cal. Rules of Court, rule 9.5 et seq.) |
| **No. 132577** | ) |
| | ) [ ] Felony; |
| | ) [ ] Crime(s) involved moral turpitude; |
| A Member of the State Bar | ) [ ] Probable cause to believe the crime(s) involved moral |
| | ) turpitude; |
| | ) [X] Crime(s) which may or may not involve moral turpitude or |
| | ) other misconduct warranting discipline; |
| | ) [ ] Transmittal of Notice of Finality of Conviction. |

To the CLERK OF THE STATE BAR COURT:

1. Transmittal of records.

[ X ] A. Pursuant to the provisions of Business and Professions Code, section 6101-6102 and California Rules of Court, rule 9.5 et seq., the Office of the Chief Trial Counsel transmits a certified copy of the record of convictions of the following member of the State Bar and for such consideration and action as the Court deems appropriate:

[ ] B. Notice of Appeal

[ ] C. Evidence of Finality of Conviction (Notice of Lack of Appeal)

[ ] D. Other

kwiktag ® 152 148 142

Name of Member: Jon Jay Eardley

Date member admitted to practice law in California: December 11, 1987

Member's Address of Record: 6113 Capobella

Aliso Viejo, CA 92656

2. Date and court of conviction; offense(s).

The record of conviction reflects that the above-named member of the State Bar was convicted as follows:

Date of entry of conviction: February 1, 2013

Convicting court: Superior Court of California, County of Riverside

Case number(s): INM1108103

Case number(s):   INM1108103

Crime(s) of which convicted and classification(s): Violation of Penal Code § 415(2) (Disturbing the Peace), one count, a misdemeanor which may or may not involve moral turpitude as in *In the Matter of Babero* ((Review Dept. 1993) 2 Cal. State Bar Ct. Rptr. 322.

[  ]  3.  Compliance with Rule 9.20.  (Applicable only if checked.)

We bring to the Court's attention that, should the Court enter an order of interim suspension herein, the Court may wish to require the above-named member to comply with the provisions of rule 9.20, California Rules of Court, paragraph (a), within 30 days of the effective date of any such order; and to file the affidavit with the Clerk of the State Bar Court provided for in paragraph (c) of rule 9.20 within 40 days of the effective date of said order, showing the member's compliance with the provisions of rule 9.20.

[ X ]  4.  Other information to assist the State Bar Court

On February 1, 2013, the complaint was orally amended to add PC415(2), a misdemeanor, as count four.
Respondent then plead guilty to the added count four and the remaining counts were dismissed.

DOCUMENTS TRANSMITTED:

Complaint
Plea Form
Criminal Minutes dated 02/01/13 (conviction and sentencing)

THE STATE BAR OF CALIFORNIA
OFFICE OF THE CHIEF TRIAL COUNSEL

DATED:   30 May 2013                    BY: _____
                                              Charles A. Murray
                                              Senior Trial Counsel

A copy of this transmittal and its
Attachments have been sent to:

         Jon Jay Eardley
         6113 Capobella
         Aliso Viejo, CA 92656

# DECLARATION OF SERVICE
by
U.S. CERTIFIED MAIL/U.S. REGULAR MAIL

CASE NUMBER(s): **11-C-16445**

I, the undersigned, am over the age of eighteen (18) years and not a party to the within action, whose business address and place of employment is the State Bar of California, 1149 South Hill Street, Los Angeles, California 90015, declare that:

- on the date shown below, I caused to be served a true copy of the within document described as follows:

**TRANSMITTAL OF RECORDS OF CONVICTION OF ATTORNEY; COMPLAINT; PLEA FORM; CRIMINAL MINUTES DATED 2/1/13 (CONVICTION AND SENTENCING)**

☐ **By U.S. First-Class Mail: (CCP §§ 1013 and 1013(a))**
- in accordance with the practice of the State Bar of California for collection and processing of mail, I deposited or placed for collection and mailing in the City and County of Los Angeles.

☒ **By U.S. Certified Mail: (CCP §§ 1013 and 1013(a))**

☐ **By Overnight Delivery: (CCP §§ 1013(c) and 1013(d))**
- I am readily familiar with the State Bar of California's practice for collection and processing of correspondence for overnight delivery by the United Parcel Service ('UPS').

☐ **By Fax Transmission: (CCP §§ 1013(e) and 1013(f))**
Based on agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed herein below. No error was reported by the fax machine that I used. The original record of the fax transmission is retained on file and available upon request.

☐ **By Electronic Service: (CCP § 1010.6)**
Based on a court order or an agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the person(s) at the electronic addresses listed herein below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐ *(for U.S. First-Class Mail)* in a sealed envelope placed for collection and mailing at Los Angeles, addressed to: *(see below)*

☒ *(for Certified Mail)* in a sealed envelope placed for collection and mailing as certified mail, return receipt requested,
Article No.:         7196 9008 9111 6411 4567          at Los Angeles, addressed to: *(see below)*

☐ *(for Overnight Delivery)* together with a copy of this declaration, in an envelope, or package designated by UPS,
Tracking No.:                                                          addressed to: *(see below)*

| Person Served Via Certified Mail | Business-Residential Address | Fax Number | Person Served via U.S. Regular Mail Courtesy Copy to: |
|---|---|---|---|
| JON JAY EARDLEY | 6113 CAPOBELLA ALISO VIEJO, CA 92656 | Electronic Address | |

☐ **via inter-office mail regularly processed and maintained by the State Bar of California addressed to:**

**N/A**

I am readily familiar with the State Bar of California's practice for collection and processing of correspondence for mailing with the United States Postal Service, and overnight delivery by the United Parcel Service ('UPS'). In the ordinary course of the State Bar of California's practice, correspondence collected and processed by the State Bar of California would be deposited with the United States Postal Service that same day, and for overnight delivery, deposited with delivery fees paid or provided for, with UPS that same day.

I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date on the envelope or package is more than one day after date of deposit for mailing contained in the affidavit.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct. Executed at Los Angeles, California, on the date shown below.

DATED:  MAY 31, 2013          SIGNED: *Kim Wimbish*
                                                    KIM WIMBISH
                                                    Declarant

# PUBLIC MATTER

1  STATE BAR OF CALIFORNIA
   OFFICE OF THE CHIEF TRIAL COUNSEL
2  JAYNE KIM, No. 174614
   CHIEF TRIAL COUNSEL
3  JOSEPH R. CARLUCCI, No. 172309
   DEPUTY CHIEF TRIAL COUNSEL
4  MELANIE J. LAWRENCE, No. 230102
   ASSISTANT CHIEF TRIAL COUNSEL
5  MIA R. ELLIS, No. 228235
   SUPERVISING SENIOR TRIAL COUNSEL
6  845 South Figueroa Street
   Los Angeles, California 90017-2515
7  Telephone: (213) 765-

**FILED**

JAN 2 2 2015

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

9  STATE BAR COURT

10  HEARING DEPARTMENT - LOS ANGELES

12  In the Matter of:                    )  Case No.  14-N-02737
                                         )
13  JON JAY EARDLEY,                     )  NOTICE OF DISCIPLINARY CHARGES
    No. 132577,                          )
14                                       )
                                         )
15  A Member of the State Bar.           )

16  **NOTICE - FAILURE TO RESPOND!**

17  **IF YOU FAIL TO FILE A WRITTEN ANSWER TO THIS NOTICE
    WITHIN 20 DAYS AFTER SERVICE, OR IF YOU FAIL TO APPEAR AT**
18  **THE STATE BAR COURT TRIAL:**

19  **(1)  YOUR DEFAULT WILL BE ENTERED;**
    **(2)  YOUR STATUS WILL BE CHANGED TO INACTIVE AND YOU**
20  **WILL NOT BE PERMITTED TO PRACTICE LAW;**
    **(3)  YOU WILL NOT BE PERMITTED TO PARTICIPATE FURTHER IN**
21  **THESE PROCEEDINGS UNLESS YOU MAKE A TIMELY MOTION
    AND THE DEFAULT IS SET ASIDE, AND;**
22  **(4)  YOU SHALL BE SUBJECT TO ADDITIONAL DISCIPLINE.
    SPECIFICALLY, IF YOU FAIL TO TIMELY MOVE TO SET ASIDE**
23  **OR VACATE YOUR DEFAULT, THIS COURT WILL ENTER AN
    ORDER RECOMMENDING YOUR DISBARMENT WITHOUT**
24  **FURTHER HEARING OR PROCEEDING.  SEE RULE 5.80 ET SEQ.,
    RULES OF PROCEDURE OF THE STATE BAR OF CALIFORNIA.**

kwiktag *      183 822 816

-1-

1   The State Bar of California alleges:

2   JURISDICTION

3   1.  JON JAY EARDLEY ("respondent") was admitted to the practice of law in the State

4   of California on December 11, 1987, was a member at all times pertinent to these charges, and is

5   currently a member of the State Bar of California.

6   COUNT ONE

7   Case No. 14-N-02737
California Rules of Court, rule 9.20

8   [Failure to Obey Rule 9.20]

9   2.  Respondent failed to file a declaration of compliance with California Rules of

10   Court, rule 9.20 in conformity with the requirements of rule 9.20(c) with the clerk of the State

11   Bar Court by April 10, 2014, as required by Supreme Court order no. S214605, in willful

12   violation of California Rules of Court, rule 9.20.  (A true and correct copy of the rule 9.20 order

13   is attached hereto as Exhibit 1 and is incorporated by reference.)

14   **NOTICE - INACTIVE ENROLLMENT!**

15   **YOU ARE HEREBY FURTHER NOTIFIED THAT IF THE STATE BAR
COURT FINDS, PURSUANT TO BUSINESS AND PROFESSIONS CODE**

16   **SECTION 6007(c), THAT YOUR CONDUCT POSES A SUBSTANTIAL
THREAT OF HARM TO THE INTERESTS OF YOUR CLIENTS OR TO**

17   **THE PUBLIC, YOU MAY BE INVOLUNTARILY ENROLLED AS AN
INACTIVE MEMBER OF THE STATE BAR.   YOUR INACTIVE**

18   **ENROLLMENT WOULD BE IN ADDITION TO ANY DISCIPLINE
RECOMMENDED BY THE COURT.**

19

20   **NOTICE - COST ASSESSMENT!**

21   **IN   THE   EVENT   THESE   PROCEDURES   RESULT   IN   PUBLIC
DISCIPLINE, YOU MAY BE SUBJECT TO THE PAYMENT OF COSTS**

22   **INCURRED BY THE STATE BAR IN THE INVESTIGATION, HEARING
AND REVIEW OF THIS MATTER PURSUANT TO BUSINESS AND**

23   **PROFESSIONS CODE SECTION 6086.10.**

24   Respectfully submitted,

25   THE STATE BAR OF CALIFORNIA
OFFICE OF THE CHIEF TRIAL COUNSEL

26   DATED:  January 22, 2015          By:

27   MIA R. ELLIS
Supervising Senior Trial Counsel

28   -2-

 **The State Bar of California**

**Jon Jay Eardley #132577**
License Status: Not Eligible to Practice Law

Address: 6113 Capobella, Aliso Viejo, CA 92656
Phone: Not Available | Fax: Not Available
Email: Not Available | Website: Not Available

## More about This Attorney ▼

**All changes of license status due to nondisciplinary administrative matters and disciplinary actions.**

| Date | License Status ℹ | Discipline ℹ | Administrative Action ℹ |
|------|------------------|--------------|-------------------------|
| Present | Not eligible to practice law in CA | | |
| 5/21/2015 | Not eligible to practice law in CA | Ordered inactive | |
| 2/7/2015 | Not eligible to practice law in CA | Ordered inactive 15-TB-10565 ℹ | |
| 1/22/2015 | | Disciplinary charges filed in State Bar Court 14-N-02737 ℹ | |
| 3/1/2014 | Not eligible to practice law in CA | Discipline w/actual suspension 08-O-10075 ℹ | |
| 9/22/2013 | Not eligible to practice law in CA | Ordered inactive 11-C-16445 ℹ | |
| 5/31/2013 | | Conviction record transmitted to State Bar Court 11-C-16445 ℹ | |
| 7/1/2011 | Not eligible to practice law in CA | | Suspended, failed to pay fees |
| 3/11/2011 | Not eligible to practice law in CA | Ordered inactive 08-O-10075 ℹ | |
| 10/14/2010 | | Disciplinary charges filed in State Bar Court 08-O-10075 ℹ | |
| 12/11/1987 | Admitted to the State Bar of California | | |

### State Bar Court Cases
**The listing below is partial, as the State Bar Court is transitioning to online dockets. Please refer to the License Status, Disciplinary and Administrative History section above for a record of discipline cases. Case dockets and documents may be available using the State Bar Court Search for a Case feature; see instructions below.**

| Effective Date ℹ | Case Number | Description ℹ |
|------------------|-------------|---------------|
| 3/1/2014 | 08-O-10075 | Decision [PDF] |
| Pending | 14-N-2737 | Initiating Document [PDF] |
| Pending | 14-N-2737 | Response [PDF] |
| Pending | 11-C-16445 | Initiating Document [PDF] |

Here is what you need to know to access discipline documents in public cases:

Documents are added to the State Bar Court's online docket as events occur.

Search for a Case

To search for a case, please copy the case number displayed above and click Search for a Case. In the search box, paste the complete case number. If the case number begins with "19" or higher, you must add the prefix SBC to the case number, e.g., SBC [CASE NUMBER]. If a case number begins with 18 or lower, there's no need to add SBC.

Most public case records since 2000 are available through search. Older case records are available on request. The State Bar Court began posting public discipline documents online in 2005.

NOTE: Only Published Opinions may be cited or relied on as precedent in State Bar Court proceedings.

DISCLAIMER: Any posted Notice of Disciplinary Charges, Conviction Transmittal or other initiating document, contains only allegations of professional misconduct. The licensee is presumed to be innocent of any misconduct warranting discipline until the charges have been proven.

**Additional Information:**
- About the disciplinary system

Copyright © 2021 The State Bar of California

