Jon J. Eardley, SB#132577
30025 Alicia Parkway, #309
Laguna Niguel, CA 92677
Phone Number (949-434-4943)
Email Address (jon.eardley@aol.com)
In Pro Per

```
                        FILED
               CLERK, U.S. DISTRICT COURT

               10-19-21

            CENTRAL DISTRICT OF CALIFORNIA
            BY: _____KMH_____ DEPUTY
```

IN THE SUPREME COURT OF THE UNITED STATES OF AMERICA

| | |
|---|---|
| EX PENNSYLVANIA EX REL JON JAY EARDLEY ET AL.,<br><br>        The Relators,<br><br>    vs.<br><br>CALIFORNIA,<br><br>        Defendant.<br>_____<br>JON JAY EARDLEY, EX. REL. THE UNITED STATES OF AMERICA, EX. REL. JON JAY EARDLEY,<br><br>        Relator and Appellant,<br><br>    vs.<br><br>CALIFORNIA,<br><br>        Defendant.<br>_____<br>JON JAY EARDLEY, EX. REL. THE UNITED STATES OF AMERICA, EX. REL. JON JAY EARDLEY,<br><br>        Relator and Appellant,<br><br>    vs.<br><br>STATE BAR OF CALIFORNIA,<br>_____ | Supreme Court Case No.:<br><br>District Court Case No.: 2:21-cv-07758-SB-AFM<br><br>NOTICE OF APPEAL AND PETITION FOR WRIT OF CORAM VOBIS RESIDENT; AND ADDITIONAL RELIEF<br><br>[28 U.S.C. Sec. 1253; 28 U.S.C. Sec. 2284; 42 U.S.C. Sec. 2000a-5; 42 U.S.C. Sec. 2000e-6; U.S. Const., Art.I, Sec. 8, Clause 18.; Const., Art.III, Secs. 2 and 3] |

|  |  |
|---|---|
| Appellee. | ) |
| | ) |
| _____ | ) |
| | ) |
| STATE BAR OF CALIFORNIA, | ) |
| | ) |
| vs. | ) |
| | ) |
| JON JAY EARDLEY, | ) |
| | ) |
| Appellant. | ) |
| _____ | ) |

Pursuant to 28 U.S.C. Sec. 1253; 28 U.S.C. Sec. 2101; 28 U.S.C. Sec. 2284; 42 U.S.C. Sec. 2000a-5; 42 U.S.C. Sec. 2000e-6; U.S. Const. Art.I, Sec. 8, Clause 18; and Art. III, Secs. 2 and 3, Respondent and Relators, hereby appeal, in its entirety, the District Court order of October 5, 2021, dismissing the matter.

**STATUTORY FRAMEWORK**

28 U.S.C. Sec. 1253 provides as follows: "Except as otherwise provided by law, any party may appeal to the Supreme Court from an order granting or denying, after notice and hearing, an interlocutory or permanent injunction in any civil action, suit or proceeding required by any Act of Congress to be heard and determined by a district court of three judges."

28 U.S.C. Sec. 2101 provides as follows: "(a)A direct appeal to the Supreme Court from any decision under section 1253 of this title, holding unconstitutional in whole or in part, any Act of Congress, shall be taken within thirty days after the entry of the interlocutory or final order, judgment or decree. The record shall be made up and the case docketed within sixty days from the time such appeal is taken under rules prescribed by the Supreme Court.

(b) Any other direct appeal to the Supreme Court which is authorized by law, from a decision of a district court in any civil action, suit or proceeding, shall be taken within thirty days from the judgment, order or decree, appealed from, if interlocutory, and within sixty days if final.

(c) Any other appeal or any writ of certiorari intended to bring any judgment or decree in a civil action, suit or proceeding before the Supreme Court for review shall be taken or applied for within ninety days after the entry of such judgment or decree. A justice of the Supreme Court, for good cause shown, may extend the time for applying for a writ of certiorari for a period not exceeding sixty days.

(d) The time for appeal or application for a writ of certiorari to review the judgment of a State court in a criminal case shall be as prescribed by rules of the Supreme Court.

(e) An application to the Supreme Court for a writ of certiorari to review a case before judgment has been rendered in the court of appeals may be made at any time before judgment.

(f) In any case in which the final judgment or decree of any court is subject to review by the Supreme Court on writ of certiorari, the execution and enforcement of such judgment or decree may be stayed for a reasonable time to enable the party aggrieved to obtain a writ of certiorari from the Supreme Court. The stay may be granted by a judge of the court rendering the judgment or decree or by a justice of the Supreme Court, and may be conditioned on the giving of security, approved by such judge or justice, that if the aggrieved party fails to make application for such writ within the period allotted therefor, or fails to obtain an order granting his

application, or fails to make his plea good in the Supreme Court, he shall answer for all damages and costs which the other party may sustain by reason of the stay.

(g) The time for application for a writ of certiorari to review a decision of the United States Court of Appeals for the Armed Forces shall be as prescribed by rules of the Supreme Court."

28 U.S.C. Sec. 2284 states as follows:

"(a) A district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body.

(b) In any action required to be heard and determined by a district court of three judges under subsection (a) of this section, the composition and procedure of the court shall be as follows:

(1) Upon the filing of a request for three judges, the judge to whom the request is presented shall, unless he determines that three judges are not required, immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge. The judges so designated, and the judge to whom the request was presented, shall serve as members of the court to hear and determine the action or proceeding.

(2) If the action is against a State, or officer or agency thereof, at least five days' notice of hearing of the action shall be given by registered or certified mail to the Governor and attorney general of the State.

(3)A single judge may conduct all proceedings except the trial, and enter all orders permitted by the rules of civil procedure except as provided in this subsection. He may grant a temporary restraining order on a specific finding, based on evidence submitted, that specified irreparable damage will result if the order is not granted, which order, unless previously revoked by the district judge, shall remain in force only until the hearing and determination by the district court of three judges of an application for a preliminary injunction. A single judge shall not appoint a master, or order a reference, or hear and determine any application for a preliminary or permanent injunction or motion to vacate such an injunction, or enter judgment on the merits. Any action of a single judge may be reviewed by the full court at any time before final judgment.

42 U.S.C. Sec. 2000a-5 provides as follows:

"(a)  Complaint

Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1) signed by him (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for

such pattern or practice, as he deems necessary to insure the full
enjoyment of the rights herein described.

(b)  Three-judge district court for cases of general public
importance: hearing, determination, expedition of action, review by
Supreme Court; single judge district court: hearing, determination,
expedition of action

In any such proceeding the Attorney General may file with the
clerk of such court a request that a court of three judges be
convened to hear and determine the case.  Such request by the Attorney
General shall be accompanied by a certificate that, in his opinion,
the case is of general public importance.  A copy of the certificate
and request for a three-judge court shall be immediately furnished by
such clerk to the chief judge of the circuit (or in his absence, the
presiding circuit judge of the circuit) in which the case is pending.
Upon receipt of the copy of such request it shall be the duty of the
chief judge of the circuit or the presiding circuit judge, as the
case may be, to designate immediately three judges in such circuit,
of whom at least one shall be a circuit judge and another of whom
shall be a district judge of the court in which the proceeding was
instituted, to hear and determine such case, and it shall be the duty
of the judges so designated to assign the case for hearing at the
earliest practicable date, to participate in the hearing and
determination thereof, and to cause the case to be in every way
expedited.  An appeal from the final judgment of such court will lie
to the Supreme Court.

In the event the Attorney General fails to file such a request
in any such proceeding, it shall be the duty of the chief judge of
the district (or in his absence, the acting chief judge) in which the

case is pending immediately to designate a judge in such district to hear and determine the case.  In the event that no judge in the district is available to hear and determine the case, the chief judge of the district, or the acting chief judge, as the case may be, shall certify this fact to the chief judge of the circuit (or in his absence, the acting chief judge) who shall then designate a district or circuit judge of the circuit to hear and determine the case. It shall be the duty of the judge designated pursuant to this section to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited.

42 U.S.C. Sec. 2000e-6 provides as follows:

"(a)Complaint

Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1) signed by him (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described.

(b)Jurisdiction; three-judge district court for cases of general public importance: hearing, determination, expedition of action,

review by Supreme Court; single judge district court: hearing, determination, expedition of action

The district courts of the United States shall have and shall exercise jurisdiction of proceedings instituted pursuant to this section, and in any such proceeding the Attorney General may file with the clerk of such court a request that a court of three judges be convened to hear and determine the case. Such request by the Attorney General shall be accompanied by a certificate that, in his opinion, the case is of general public importance. A copy of the certificate and request for a three-judge court shall be immediately furnished by such clerk to the chief judge of the circuit (or in his absence, the presiding circuit judge of the circuit) in which the case is pending. Upon receipt of such request it shall be the duty of the chief judge of the circuit or the presiding circuit judge, as the case may be, to designate immediately three judges in such circuit, of whom at least one shall be a circuit judge and another of whom shall be a district judge of the court in which the proceeding was instituted, to hear and determine such case, and it shall be the duty of the judges so designated to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case to be in every way expedited. An appeal from the final judgment of such court will lie to the Supreme Court.

In the event the Attorney General fails to file such a request in any such proceeding, it shall be the duty of the chief judge of the district (or in his absence, the acting chief judge) in which the case is pending immediately to designate a judge in such district to hear and determine the case. In the event that no judge in the

district is available to hear and determine the case, the chief judge
of the district, or the acting chief judge, as the case may be, shall
certify this fact to the chief judge of the circuit (or in his
absence, the acting chief judge) who shall then designate a district
or circuit judge of the circuit to hear and determine the case.

It shall be the duty of the judge designated pursuant to this
section to assign the case for hearing at the earliest practicable
date and to cause the case to be in every way expedited.

(c) Transfer of functions, etc., to Commission; effective date;
prerequisite to transfer; execution of functions by Commission

Effective two years after March 24, 1972, the functions of the
Attorney General under this section shall be transferred to the
Commission, together with such personnel, property, records, and
unexpended balances of appropriations, allocations, and other funds
employed, used, held, available, or to be made available in
connection with such functions unless the President submits, and
neither House of Congress vetoes, a reorganization plan pursuant to
chapter 9 of title 5, inconsistent with the provisions of this
subsection. The Commission shall carry out such functions in
accordance with subsections (d) and (e) of this section.

(d) Transfer of functions, etc., not to affect suits commenced
pursuant to this section prior to date of transfer

Upon the transfer of functions provided for in subsection (c) of
this section, in all suits commenced pursuant to this section prior
to the date of such transfer, proceedings shall continue without
abatement, all court orders and decrees shall remain in effect, and
the Commission shall be substituted as a party for the United States

of America, the Attorney General, or the Acting Attorney General, as appropriate.

(e) Investigation and action by Commission pursuant to filing of charge of discrimination; procedure

Subsequent to March 24, 1972, the Commission shall have authority to investigate and act on a charge of a pattern or practice of discrimination, whether filed by or on behalf of a person claiming to be aggrieved or by a member of the Commission. All such actions shall be conducted in accordance with the procedures set forth in section 2000e-5 of this title.

## CONSTITUTIONAL PROVISIONS

### ARTICLE I

Art. I, Sec. 8, Clause 18.: "The Congress shall have power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States; but all duties, imposts and excises shall be uniform throughout the United States;

To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof."

### ARTICLE III

Sec. 2: "The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority;--to all cases affecting ambassadors, other public ministers and consuls;--to all cases of admiralty and maritime jurisdiction;--to controversies to which the United States shall be a party;--to controversies between two or more states;--between a state and citizens of another state;--between citizens of different states;--between citizens of the same state claiming lands under grants of different states, and between a state, or the citizens thereof, and foreign states, citizens or subjects.

In all cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be party, the Supreme Court shall have original jurisdiction. In all the other cases before mentioned, the Supreme Court shall have appellate jurisdiction, both as to law and fact, with such exceptions, and under such regulations as the Congress shall make.

The trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the state where the said crimes shall have been committed; but when not committed within any state, the trial shall be at such place or places as the Congress may by law have directed."

Sec. 3: "Treason against the United States, shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort. No person shall be convicted of treason unless on the testimony of two witnesses to the same overt act, or on confession in open court.

The Congress shall have power to declare the punishment of treason, but no attainder of treason shall work corruption of blood, or forfeiture except during the life of the person attainted."

## **AVERMENTS AND ALLEGATIONS**

Appellant specifically and timely filed an objection to the Magistrate Judge. Nevertheless, the Magistrate proceeded to dismiss the case almost immediately, and the district judge signed off on it. The entire action was dismissed in approximately three business days. However, it was not dismissed prior to appellant's objection to the magistrate judge.  The electronic records provided to appellant clearly indicate that his objection was made prior to the matter being sent to chambers. Further it is the contention of the appellant that magistrate judge may not hear removal actions for the same statutory reason they cannot hear felony criminal matters and matters potentially implicating Article III, Sections 2 & 3. Under the circumstances, the appellant could not request the three judge district court from the trial judge as specified in 28 U.S.C. Sec. 2284. See also 42 U.S.C. Sec. 2000a-5 and 2000e-6.

Hence, direct appeal to this court is appropriate pursuant to 18 U.S.C. Sec(s). 1253, 2101, and 2284.

In view of the unresolved and un-investigated conspiracy within the State Bar of California, and its so called "disciplinary system" a permanent RICO injunction shutting down the State Bar Court and the State Bar of California forever is appropriate and absolutely necessary herein, as well as the provision of additional relief.

## THE STATE BAR OF CALIFORNIA IS A MULTI-FACETED RACKETEERING ENTERPRISE THAT IS INIMICAL TO THE INTERESTS OF JUSTICE

The State bar court is a RICO enterprise that favors one group of lawyers, over certain "target" individuals who have been chosen for public rituals and suffering, based upon factors such as their surnames and whether they are likely candidates for federal appointments. In this case, the State Bar of California has engaged in kidnapping of his children in an attempt to destroy him, to cause him great emotional harm, and to deny him a position as a resident Trustee of the Pennsylvania State University.

In the Donziger case, the trial judge found numerous indictable acts that fell within the RICO definition of racketeering activity in 18 U.S.C. Sec. 1961(1), see, e.g., Donziger, 974 F. Supp.2d at 576-99, 601, including extortion in violation of 18 U.S.C. Sec. 1951 to deny a person his property "induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right"; wire fraud in violation of 18 U.S.C. Sec 1343 (communicating or foreseeably causing communication "by means of wire…in interstate or foreign commerce," of "writings," etc., in furtherance of a scheme or artifice to defraud, or [to] obtain money or property" by way of "false or fraudulent pretenses, representations, or promises"); obstruction of justice in violation of 18 U.S.C. Sec. 1503 ("corruptly…endeavoring to influence, obstruct, or impede, the due administration of justice."

The memorandum prepared by State Bar Investigators and withheld from Mr. Eardley for over five years makes it entirely clear that the intent of the State Bar of California was and is to obstruct justice

under federal law, to continue to deny <u>Brady</u> evidence in a pending state bar action for "disturbing the peace," and engaging in numerous felonies against Mr. Eardley by virtue of their failure to provide <u>Brady</u> evidence and to request appointment of counsel for the respondent, as required by statute.  They have also refused to notify the court where the entirely phony and fraudulent proceeding was taken that is was an entirely scripted reality, designed to produce an outcome pursuant to a sophisticated technological process in cooperation with Bell Laboratories, the Intel Corporation, and its wholly held subsidiary, COS Corporation.  It is the belief of the respondent that the disturbing the peace case was contrived against him as part of an elaborate proceeding, in which the State Bar of California participated.  This we will call for now "the secret government project."

Their conduct parallels the <u>Donziger</u> case: "<u>Donziger's</u> conduct with respect to the Fajardo Declaration was obstruction of justice, plain and simple.  The declaration was drafted while the Stratus Section 1782 proceeding was pending, as <u>Donziger</u> was acutely aware. Its purpose—in Donziger's words—was to "prevent Stratus' role relative to the Cabrera report from coming out."  Donziger was involved in the communications as to what it would and would not say. He knew that it was false or misleading.  His conduct was intended to "impede…the due administration of justice," and it fell squarely within the federal obstruction of justice statute." <u>Donziger,</u> 974 F.Supp.2d at 594 & n.1470.

To this end the State Bar continues on, and engages in a highly specialized form of defamation on its website.  Posted on its website is an entirely untruthful, scurrilous, deceitful and fraudulent

"editorial" of respondent's professional career, maliciously designed to defame respondent and to be entirely ant-competitive.  To date its author or authors are unknown.  Judge Miles, formerly of the State Bar Court, specifically stated on the record that he had no idea who wrote it and that he specifically did not authorize it.  One of the objectives of this proceeding is to identify the author or authors of those defamatory statements and to bring those people to justice.

The Bar has intentionally engaged in a verifiable pattern of racketeering conduct against respondent in numerous foreign countries, such as Russia, France, Spain, China, Vietnam, England and importantly, in the City of London.

Intentionally, committing crimes in foreign countries in a particularly virulent form of conspiracy, for in this case, it is a crime not only against the individual, but also against the United States of America itself.

In Donziger, the district court noted that "[n}umerous emails were sent in furtherance of these schemes." Donziger, 974 F.Supp.2d at 590 n. 1443.  "Much of the pressure and lobbying campaign was to injure Chevron's reputation and impact its bottom line and its stock price, a campaign micromanaged by Donziger that employed many U.S. public relations advisors and lobbyists.  The State Bar's website is every bit as pervasive in the conspiracy against Mr. Eardley.  The objective clearly was and is to destroy his reputation and to defraud him of his property through the utilization of violence and oppression, and to engage in a conspiracy with individuals in the United States and in foreign countries by harboring the intent, to intend to violate specific provisions of United States Law for the

purpose of obtaining an unusual form of unjust enrichment at a specific and divided time.  See Donziger, 974 F.Supp.2d at 574.

The district court found that these acts constituted a pattern of racketeering activity within the meaning of 18 U.S.C. Sec. 1961(5) (requiring at least two acts of racketeering activity occurring within 10 years of each other).  Donziger's acts of wire fraud, bribery, obstruction of justice, and money laundering were committed as part of an at-least "five-year effort to extort and defraud Chevron' into paying a huge sum of money; and it was likely that the "demonstrated criminal activity…would continue into the future," expecially "in view of the defendants' failure thus far to achieve their goal." Donziger, 974 F.Supp.2d at 599.  Likewise, the State Bar has no intention of stopping its unmitigated anti-competitive, discriminatory, and highly abusive activity against the respondent.

The district court also permissibly found that Chevron's legal fees—those already expended to uncover Donziger's wrongful conduct and those being spent and soon-to-be spent to defend against enforcement proceedings—constituted further injury to Chevron.  See Donziger, 974 F.Supp.2d at 553, 638 "[L]egal fees may constitute RICO damages when they are proximately caused by a RICO violation." Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158, 1167 (2d Cir.), cert denied, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 334 (1993).

The Bar and its trustees have refused to provide respondent with information in its possession related to exculpatory evidence. Because of the heavy racketeering abuses committed against the respondent herein, he has been deliberately obstructed in his efforts to obtain additional evidence and discovery. Nevertheless, his

property has been damaged, stolen or otherwise compromised.  Further, the new amendments related to prosecutorial abuse and misconduct under Brady require the prosecutor to notify all other related courts and to request on behalf of the respondent that counsel be appointed to represent him in those proceedings and to inform him of additional pertinent information.  This, they intentionally did not do and continue to refuse to do, even when presented with the letter of the law and its plain and definite requirements.

Equitable relief to private plaintiffs is consistent with Congress's intent "to' encourage civil litigation to supplement government efforts to deter and penalize the...prohibited practices. The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, "private attorneys general," dedicated to eliminating racketeering activity.'" NOW I, 267 F.3d 687, 698 (7th Cir. 2001)(quoting Rotella v. Wood, 528 U.S. 549, 557, 120 S.CT. 1075, 145 L.Ed.2d 1047 (2000)); cf. Sedima, S.P.R.L. v. Imeex Co., 473 U.S. 479, 492 n.10, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)("indeed, if Congress' liberal-construction mandate is to be applied anywhere, it is in Sec. 1964, where RICO's remedial purposes are most evident."

"But Chevron's injury is in part its liability on an $8.646 billion judgment obtained through a pattern of racketeering activity; that injury, affecting its net worth, is clear and definite.  The inability to predict whether that entire amount will be collected from Chevron does not affect the amount of the liability imposed." See Donziger at 833 F.3d 74, 140 (2016).

At the same time that the lower courts were expansively interpreting RICO's enterprise element to include purely criminal

associations in fact, another line of cases held that any governmental agency, court, political office, or the like could also serve as an "enterprise."

The following cases are illustrative: United States v. Freeman, 6 F.3d 586, 596-597 (9th Cir. 1993) (offices of California's 49th Assembly District); United States v. Alonso, 740 F.2d 862, 870 (11th Cir. 1984), cert. denied, 469 U.S. 1166 (1985) (Homicide Section of Dade County Public Safety Department); United States v. Ambrose, 740 F.2d 505, 512 (7th Cir. 1984), cert denied, 472 U.S. 1017 (1985) (police department); United States v. Davis, 707 F.2d 880, 882-883 (6th Cir. 1983) (sheriff's office); United States v. Thompson, 685 F.2d 993 (6th Cir. 1982) (en banc) cert. denied, 459 U.S. 1072 (1983) (Tennessee Governor's Office); United States v. Angelilli, 660 F.2d 23 (2nd Cir. 1981), cert. denied, 455 U.S. 910, 945, 456 U.S. 939 (1982)(New York City Civil Court); United States v. Stratton, 649 F.2d 1066, 1072-1075 (5th Cir. 1981) (Florida's Third Judicial Circuit); United States v. Clark, 646 F.2d 1259, 1261-1267 (8th Cir. 1981) (office of county judge); United States v. Altomare, 625 F.2d 5, 7 (4th Cir. 1980)(office of prosecuting attorney); United States v. Vignola, 464 F.Supp. 1091 (E.D. Pa.), aff'd, 605 F.2d 1199 (3d Cir. 1979), cert. denied, 444 U.S. 1072 (1980)(traffic court).

Further, a governmental enterprise may itself be a "group of Individuals associated in fact" rather than a "legal entity" within section 1961(4). See United States v. Stratton, 649 F.2d 1066, 1075 (5th Cir. 1981); United States v. Baker, 617 F.2d 1060 (4th Cir. 1980).

It is quite clear that these defamations and multiple anti-competitive actions that have been directed at the respondent are entirely untrue and have been conducted under the auspices of the

State Bar of California and its arm, State Bar Court. The State Bar Court is clearly a racketeering enterprise that must be permanently enjoined, at least as to the respondent herein.

In United States v. Angellili, 660 F.2d 23 (2nd Cir.1981), cert. denied, 455 U.S. 910, 945, 456 U.S. 939 (1982) the court stated as follows:

"18 U.S.C. § 1961(4). The enterprise in whose activities defendants are alleged to have participated through a pattern of racketeering, is the New York City Civil Court. Defendants contend that governmental units such as the Civil Court are not enterprises within the meaning of RICO. We disagree.

"We begin with the language of the statute. On its face, the definition of "enterprise" is quite broad. We see no sign of an intention by Congress to exclude governmental units from its scope, cf. United States v. Turkette, ___ U.S. ___, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (construing "enterprise" to include illegal as well as legitimate ventures), and we note three pertinent aspects of the definition that suggest an expansive rather than a restrictive thrust. First, the term "enterprise" is defined to "include[ ]" the entities listed thereafter. The use of the word "includes," rather than a more restrictive term such as "means," "indicates that the list is not exhaustive but merely illustrative." United States v. Huber, 603 F.2d 387, 394 (2d Cir. 1979), cert. denied, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); United States v. Thevis, 474 F.Supp. 134, 138 (N.D.Ga.1979). See also 2A C. Sands, Sutherland on Statutes and Statutory Construction 82 (4th ed. 1973) ("A term whose statutory definition declares what it `includes' is more susceptible to extension of meaning by construction than where the definition

declares what a term `means'"). Second, the use of the word "any" indicates an intent to make the list all-inclusive. The inclusion of "any individual," "any ... partnership," "any ... corporation," and so forth, belies an intention to distinguish, for example, between individuals having differing statuses, or between general and limited partnerships, or between business and municipal corporations. Finally, the word "entity" itself is hardly restrictive. It denotes anything that exists. As modified by the word "legal," it suggests that any being whose existence is recognized by law is within the term "enterprise." We conclude that on its face the definition of an enterprise to "include[] any ... legal entity" is unambiguously broad, and that it does not exclude the Civil Court."

In United States v. Stratton, 649 F.2d 1066, 1072-1075 (5th Cir.1981), a judicial circuit was considered an enterprise:

"Appellants also suggest that since the Third Judicial Circuit is a government entity, it cannot constitute a RICO enterprise. We disagree. 18 U.S.C.A. § 1961(4) (West Supp.1981) defines "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."[11] It is well-settled that this definition is broad enough to include government departments and agencies such as Florida's Third Judicial Circuit. Cf. United States v. Bacheler, 611 F.2d 443 (3d Cir. 1979) (city Traffic Court); Bright, supra, 630 F.2d at 829 (sheriff's office); United States v. Brown, 555 F.2d 407 (5th Cir. 1977), cert. denied, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978) (city police department); United States v. Altomare, 625 F.2d 5 (4th Cir. 1980) (county prosecutor's office); United States v. Karas, 624 F.2d 500

(4th Cir. 1980), <u>cert. denied</u>, ___ U.S. ___, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981) (county law enforcement office); <u>United States v. Baker</u>, 617 F.2d 1060 (4th Cir. 1980) (sheriff's department); <u>United States v. Grzywacz</u>, 603 F.2d 682 (7th Cir. 1979), <u>cert. denied</u>, 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980) (Gewin, J., sitting by designation) (city police department); <u>United States v. Frumento</u>, 563 F.2d 1083 (3rd Cir. 1977), <u>cert. denied</u>, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978) (State Bureau of Cigarette and Beverage Taxes); <u>United States v. Dozier</u>, 493 F.Supp. 554 (M.D.La.1980) (State Department of Agriculture); United States v. Sisk, 476 F.Supp. 1061 (M.D.Tenn.1979) (state governor's office); United States v. Barber, 476 F.Supp. 182 (S.D. W.Va.1979) (State Alcohol Beverage Control Commissioner's Office); United States v. Vignola, 464 F.Supp. 1091 (E.D.Pa.), aff'd, 605 F.2d 1199 (3d Cir. 1979), cert. denied, 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980) (city Traffic Court)."

In <u>United States v. Clark</u>, 646 F.2d 1259, 1261-1267 (8th Cir. 1981), the court observed as follows:

"Because we have resolved the question whether a government agency or office can be a RICO "enterprise" on the basis of the language of the statute itself, we have no occasion to turn to other rules of statutory construction or the legislative history. Our conclusion is supported, however, by other parts of the RICO statute and, in part, by the legislative history, see note 14 infra.

"As discussed in United States v. Sisk, 476 F.Supp. 1061, 1062-63 (M.D.Tenn.1979) (Merritt, J., sitting by designation) (emphasis in original):

"The racketeering offenses named in the statute include many crimes, most of which are not necessarily related to governmental activity, as distinguished from private activity. But two of the crimes listed as racketeering offenses — bribery under state law and federal law and extortion under color of law (the Hobbs Act, 18 U.S.C. § 1951) — can only be committed in the context of governmental activity. At common law and under most statutes, bribery is limited to a payment given in exchange for the exercise of governmental power. Extortion under color of law is the use of governmental power to force an involuntary payment from another. By making bribery and extortion RICO offenses, Congress must be said to have understood that these offenses would be committed by governmental officials as a part of their work. Since these offenses can only be committed in the context of the work of a governmental agency, Congress must be taken to have intended that a governmental agency could be one of the types of "enterprises," the affairs of which are conducted through a pattern of racketeering offenses. The connection between the named offenses or bribery and extortion and governmental work is too close to say that government work is not one of the kinds of activity that may constitute a RICO "enterprise."

"... There is nothing in the legislative history of the statute that suggests that Congress intended to exclude governmental agencies from "enterprise" coverage. There are broad references by the Congressional Sponsors that the purpose of the statute is to keep organized crime from corrupting legitimate businesses and "governmental institutions." This is inconclusive, however. [The] point is that the plain meaning of the definition of "enterprise" given in the statute and the inclusion of bribery and extortion as

RICO offenses lead to the conclusion that a governmental agency is a RICO enterprise, and nothing in the legislative history indicates an intention to the contrary.

"We are led to the same conclusion if we look at the overall purpose of the statute and the harm it intends to counteract. The legislative history repeatedly says that the statute is designed to stop the "infiltration" of legitimate enterprises by persons who use the enterprise for the commission of certain crimes. This harm can occur just as easily in a police department, a licensing bureau or other governmental agency, as in a company or union. The harm to be counteracted is equally applicable to both public and private institutions.

"See also United States v. Frumento, supra, 563 F.2d at 1090-92; United States v. Barber, supra, 476 F.Supp. at 184-90; United States v. Vignola, supra, 464 F.Supp. at 1095-97."

In United States v. Altomare, 625 F.2d 5, 7 (4th Cir. 1980), the court held that RICO applied to the office of prosecuting attorney:

"As a result of his alleged involvement in illegal gambling activities the Prosecuting Attorney of Hancock County, West Virginia, Robert G. Altomare, was indicted April 5, 1979, on three counts for violating, and conspiring to violate, in 1977 through 1979, the Racketeer Influenced and Corrupt Organizations Act (RICO) and for violating, on January 31, 1979, the Obstruction of Justice Act, by endeavoring to induce a witness before a grand jury to testify falsely. At the same time he also stood indicted, as of February 6, 1979, for conspiring during 1979 to obstruct the enforcement of the criminal laws of West Virginia with the intent to facilitate an

illegal gambling business. Convictions ensued May 2, 1979, upon all
of the charges and Altomare appeals.

"In his brief, appellant makes 11 points against the judgments.
His fundamental defense is that the office of Prosecuting Attorney of
Hancock County is not an "enterprise" within the condemnation of
RICO. We reject such a narrow interpretation of RICO and hold that a
public entity, such as the prosecutor's office here, may be an
"enterprise" within the coverage of the statute. Accord United States
v. Baker, 617 F.2d 1060 (4th Cir. 1980). Concurring in the conclusion
reached by other courts in all but one of the previous decisions
touching on this question, we find nothing in the clear language of
the statute nor in the legislative history to suggest that Congress
intended entirely to exempt such entities from the sweep of this
legislation.

"Altomare next asserts that the County Prosecuting Attorney's
office did not have the requisite nexus with interstate commerce to
be within the jurisdiction of RICO. Because of the very nature of the
powers and duties conferred upon it, however, that office necessarily
is an institution "engaged in, or the activities of which affect,
interstate or foreign commerce." 18 U.S.C. § 1962(c). The record
reveals that interstate telephone calls regularly were placed from
the prosecutor's office, that certain of the supplies and materials
purchased and used by the prosecutor's office had their origins
outside of West Virginia, and that persons who were not citizens or
residents of the State were involved in investigations and litigation
conducted by the prosecutor's office. These contacts provide a
sufficient basis for invoking RICO's jurisdiction over the
prosecuting attorney's office. See Perez v. United States, 402 U.S.

146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); <u>United States v. Campanala</u>, 518 F.2d 352, 364 (9th Cir. 1975), <u>cert. denied</u>, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). RICO, or Title IX of the 1970 Act, is aimed at removing racketeering influences from enterprises engaged in, or the activities of which affect, interstate commerce. Through RICO, Congress hoped to reduce the burden placed upon interstate commerce by racketeers, and, to that end, Congress has given "enterprise" the broad definition previously quoted. This definition makes no exception for public entities such as the judiciary, nor do we find any basis in the legislative history for implying one. Indeed, in adopting the 1970 Act, Congress expressed a particular concern for the subversion and corruption of "our democratic processes" and the undermining of the "general welfare of the Nation and its citizens" by "organized crime". Congressional Statement of Findings and Purpose, Pub.L. No. 91-452, 84 Stat. 923."

Congress has specifically directed that RICO be "liberally construed to effectuate its remedial purposes . . ." Pub.L. No. 91-452, § 904, and the courts have recognized and given effect to that mandate. They have been in near-unanimity in rejecting challenges to the characterization of a particular entity as an "enterprise", and have held, for example, that the Pennsylvania Bureau of Cigarette and Beverage Taxes, the Pennsylvania State Senate, a municipal police department, and the Philadelphia Redevelopment Authority are all enterprises within the meaning of RICO. <u>See</u> <u>United States v. Vignola</u>, 464 F. Supp. 1091 (E.D. Pa.), aff'd, 605 F.2d 1199 (3d Cir. 1979), cert. denied, 444 U.S. 1072 (1980).

The issue of whether a foreign corporation may be alleged as the enterprise arose in one of the earliest RICO cases, <u>United States v.</u>

Parness, 503 F.2d 430 (2d Cir. 1974), cert. denied, 419 U.S. 1105 (1975).  Parness involved a fraudulent scheme by which the defendant gained control of a Carribean hotel and casino by withholding payment on debts owed to the hotel.  His failure to pay forced the victim to borrow from third parties to cover the hotel's expenses.  Parness then loaned funds to the hotel through strawmen to pay its third party obligations.  Finally, the strawmen foreclosed, leaving Parness in control of the enterprise.  He was found guilty of violating section 1962 (b).  There has been no litigation on this issue of foreign corporations constituting racketeering enterprises since Parness.

It is a well known fact that during the times of Girardi's involvement with the State Bar of California he was the owner of the Bicycle Casino in Commerce, otherwise known as the Commerce Casino. Further, there is absolutely no evidence to suggest that Girardi is still not significantly involved in the operation, if not the complete control of the State Bar of California. It would be naïve to entertain any other conclusion.

Furthermore, former state senator and State Bar Chief Prosecutor Joe Dunn has consistently stated that certain individuals who were members of the bar were invidiously targeted by the State Bar of California and prosecuted as a part of schemes that were and are anti-competitive, at the least. However, it has never been ascertained who these people are and the extant circumstances of these malicious and corrupt prosecutions, or any of the circumstances surrounding such racketeering activity.

"We also reject Barbara's claim that the evidence was insufficient to support her conviction as an aider and abettor. Her

active involvement in virtually every aspect of Parness' scheme to acquire Hotel Corp. and the subsequent cover-up warranted the jury in finding that she had associated herself with the venture and had sought to make it succeed. Nye & Nissen Corp. v. United States, 336 U.S. 613, 619 (1949), quoting in part from United States v. Peoni, 100 F.2d 401, 402 (2 Cir.1938) (L. Hand, J.); United States v. Manna, 353 F.2d 191, 192 (2 Cir.1965), cert. denied, 384 U.S. 975 (1966)." Parness at 437-438."

The activities and associations described in Parness are eerily reminiscent of the associations between the State Bar of California, Tom Girardi and spouse, Joe Dunn, Tom Layton, Howard Miller, The Real Housewives of Beverly Hills, The Bravo Network, and its parent corporation, NBC Universal, Inc., and a mysterious foreign corporation known as Bravo Entertainment.

The Parness court further observed as follows:

"It is not an overstatement to characterize the evidence of Barbara's participation as overwhelming. She purchased the cashier's checks used in connection with the Goberman loan. She stated to the person who accompanied her to the bank on February 4 that she was arranging for the takeover of a hotel. She allowed her name to be used in the loan agreement. She participated in executing on April 3 the bogus documents by which Goberman was formally divested of his stock. She acquiesced in the transfer without consideration of "her" interest in Hotel Corp. to Aliter.

"Moreover, she testified falsely before the grand jury that Levrey had furnished $150,000 in cash to be used for the Goberman loan. It is axiomatic that exculpatory statements, when shown to be false, are circumstantial evidence of guilty consciousness and have

independent probative force. United States v. Lacey, 459 F.2d 86, 89 (2 Cir.), cert. denied, 409 U.S. 860 (1972); United States v. DeAlesandro, 361 F.2d 694, 697-98 (2 Cir.), cert. denied, 385 U.S. 842 (1966). This rule has especially compelling application here, for Barbara's false testimony tended not only to conceal her own participation in the transfer of the stolen funds but furthered the cover-up initiated by her husband." Parness at 437-438.

The use of shills and stooges to acquire ownership interests at the Commerce Casino, wherein Girardi was the majority interest holder, has been specifically noted in public statements filed with the Gambling Control Commission in Sacramento. It is worth noting that the testifying witness had obtained over $500,000.00 in settlement proceeds from the Girardi law firm which she claimed had been embezzled by individuals connected to the Casino. Further it was her contention that the murders of her former boss, Dick Traweek in October of 2009 and attorney Jeffrey Tidus in December of 2009 were in some way connected. Jeffrey Tidus, a former State Bar Governor and Commerce Casino owner, had been murdered execution style. Just hours before his execution, three executives of New Century Financial, his former client, had been accused of fraud. The case has never been solved. See Testimony of Leslie Stevenson before California Gambling Commission, March 24, 2011.

Girardi's interests in the Bicycle Casino(i.e. "Commerce Casino") parallel the interests of the United States Government in that "project." Finally, in 1996, the situation became so embarrassing for the CIA that the United States had to sell its interests in the Commerce Casino, however, not without some difficulty and the brokerage of Girardi himself. It is interesting

to note that the government acquired its interests by virtue of the RICO laws.

"The government acquired its interest in the Bicycle Club pursuant to 18 U.S.C. § 1963 as a result of the conviction of Benjamin Barry Kramer and Michael Gilbert for violation of the Racketeer Influence and Corrupt Organizations Act ("RICO"). The Bicycle Club is operated by a joint venture between Park Place Associates, Ltd. ("PPA") and LCP Associates, Ltd. ("LCP"). At the conclusion of ancillary forfeiture proceedings in this matter, the court determined that LCP was a mere nominee for BTR, a partnership between Benjamin Barry Kramer, Randy Thomas Lanier, George Paul Brock and Eugene Albert Fischer and that Kramer and his associates established the Bicycle Club for purposes of money laundering. United States v. Kramer, 807 F.Supp. 707 (S.D.Fla.1991)." See United States v. Kramer, 957 F. Supp. 223 (1997).

However, in that very case, what was not made clear to the court was the involvement of Girardi and the Girardi and Keese law firm in the operation and ownership of the Commerce Casino.

The court further points out:

"The meeting was fairly short on the evening of the 17th. Jack Kramer revealed the contents of the conversation to be a discussion between him and Sam as to the money flow, which is reflected on Government's Exhibit 182. The next morning Sam prepared the chart (Govt.Ex. 183) and, referring to Hardie, Lyon, Pierson and Coyne, said: "these are your straw people. These are lily-white people who will be approved by the Gambling Commission:" These are "the names."" United States v. Kramer, 957 F. Supp. At 228, fn. 3.

Clearly, the use of "strawmen" is indicative of the circumstances in Parness and that surrounding the Commerce Casino. Further, the use of unpaid debts factors heavily into the acquisition of ownership interests in both the casino in Parness and the Commerce Casino. What is interesting, however, is the existence of a foreign corporation with respect to the application of the RICO laws in both circumstances. That corporation is engaged in a highly sophisticated operation that has likely penetrated NBC/Universal and whose activities are related to violations of 18 U.S.C. Sec. 831 and 18 U.S.C. Sec 1961. See Chua Han Mow v. United States, 730 F.2d 1308, 1311 (9th Cir. 1984), cert. denied, 470 U.S. 1031 (1985). Importantly, see also United States v. Cotton, 471 F.2d 744, 750 (9th Cir.); United States v. Layton, 855 F.2d 1388, 1395 (9th Cir. 1988).

Circumstantial evidence is clearly available to link the State Bar of California to the operations of the Commerce Casino for a period in excess of thirty years, and as part of the "secret government project" involving the United States by and through the auspices of the Central Intelligence Agency.

Part of this "project" involves the laundering of money pursuant to schedule.  Having drug money laundered at the Commerce Casino nets the Casino approximately $100,000.00 per specified millions of dollars exchanged, all in violation of 18 U.S.C. Sec. 1956-1957.

"As this court noted in United States v. Elliott, 571 F.2d 880, 898 (5th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), proof of association with a RICO enterprise may depend wholly on circumstantial evidence. The record in this case contains such evidence. Although Thevis had purportedly sold his interest in the pornography business to his secretary, Laverne Bowden, for $16

million dollars, the note securing the sale was always in default. Thevis, therefore, could foreclose at any time and regain his interest in the business. Rodney Glen Smith, a cellmate of Thevis in 1977, testified that despite the "sale," Thevis stated he still "controlled" his pornography empire; given the terms of the "sale" and the fact Thevis had contacted Ms. Bowden after his escape from jail in 1978, one could infer that Thevis' interest in the success of the pornography enterprise continued until the Underhill murder. The murder itself, moreover, neatly advanced Thevis' interests in the enterprise. The original indictment in the case sought forfeiture of all the assets of Global and Fidelity under RICO forfeiture provisions. The Underhill murder was designed to prevent the government's key witness from testifying at trial, thus imperiling the government's entire RICO case and preventing both RICO criminal convictions and forfeiture. The murder, therefore, protected the integrity of the enterprise. Keeping the enterprise together was inextricably tied to furthering its business; hence the Underhill murder was a proper predicate act under § 1962. See <u>United States v. Welch</u>, 656 F.2d 1039, 1060-62 (5th Cir. 1981) (predicate acts only required to have sufficient nexus with enterprise to be properly charged under RICO)."  <u>See</u> <u>United States v. Thevis</u>, 665 F.2d 616, 625 (5th Cir. 1982).

The State Bar of California has discriminated against the respondent because of the type of work he has done as a lawyer, receiving a commendation from Attorney General Brown in the same case for which he was "disciplined" by this racketeering organization, and for reasons that date back to the time when he was a small child in the Commonwealth of Pennsylvania, where he assisted the Pennsylvania

Attorney General's Office and its Bureau of Narcotics, in the real America. The State Bar of California has gone so far as to participate in a scheme against the respondent to have him prosecuted for "disturbing the peace," throwing him in jail where he was brutally tortured by Riverside County Sheriffs deputies while suffering from a 99% blockage in his coronary artery, and having his children kidnapped and trafficked, all intentionally in violation of the racketeering laws of the united states.

The action against the respondent constitutes blatant racketeering activity.  To support a conviction under § 1028(a)(2), the Government need only prove that the State Bar and its operatives "knowingly transfer[ed] an identification document or a false identification document knowing that such document was stolen or produced without lawful authority." 18 U.S.C. § 1028(a)(2). Section 1028(d)(4) defines the term "false identification document" as "a document of a type intended or commonly accepted for the purposes of identification of individuals that ... appears to be issued by or under the authority of the United States Government, a State, [or] a political subdivision of a State...." 18 U.S.C. § 1028(d)(4)(B). Also, the transfer had to be in or affecting interstate commerce. 18 U.S.C. § 1028(c)(3)(A).

Herein, there is no question they knew what they were doing and how it would harm the respondent and his children. Still, to this day, knowing what they have done, they refuse to act because they assume they will continue to be protected by a larger syndicate that purports to be a part of "the secret government project" that exists within the military industrial complex and of course, the Central Intelligence Agency. See 21 U.S.C. 848.

The State Bar of California, and the County of Riverside knowingly and willingly participated in this stunt against the respondent and his children, knowing that the State Bar of California had a memorandum in its possession that completely exonerated the respondent of any wrongdoing.  The State Bar of California was required to present the information to the Riverside County court and to demand that counsel be appointed. It intentionally did not do so. Such a failure under state law constitutes a felony by State Bar Prosecutors. This memorandum was prepared and intentionally suppressed in violation of <u>Brady</u>, and while knowing they were maintaining pending false proceedings and covering up the fraud and criminality of all of their so-called "disciplinary" proceedings.  It is worth noting that former State Bar Chief Trial Counsel, who was found to have intentionally misled the bar, is currently in the employ of the University of California, where the "secret government project" has its nefarious origins involving violations of 18 U.S.C Sec. 794, 18 U.S.C. Sec. 1831, 18 U.S.C. sec 1959, and 18 U.S.C. Sec. 2381., et al.

One purpose in RICO is an "exercise in public education and ritual denunciation of criminal activity." Lynch, RICO: The Crime of Being a Criminal (pts. 1-4), 87 Colum.L.Rev. 661, 969 (1987).  In this case the so-called mission of the State Bar is to protect the public. However, if anything, the state bar has endangered the public by engaging in behavior that is antithetical to moral decency and the rule of law.  Further, it has engaged in anti-competitive conduct that is in flagrant opposition to the Supreme Court's decision in <u>North Carolina State Board of Dental Examiners v. FTC</u>, 574 U.S. 494, 135 S. Ct. 1101, 191 L. Ed. 2d 35 (2015).

All of these actions were designed to cause the suspension of the respondent from practice in March of 2011.  Respondent was divested of his position as counsel in the multi-district litigation that he started, In Polycarbonate Plastics Products Liability Litigation (E.D. Missouri, MDL).  What the Bar does not tell the public in its defamatory web site is that it was the respondent who started the entire BPA Free movement. The case was reviewed by the United States Senate, and was later approved of by the FDA.

Once the BPA case was removed from the complex litigation department of the Los Angeles Superior Court, it was Tom Girardi who controlled all aspects of the case.  It was at that time that Howard Miller, Girardi's partner, became president of the State Bar of California.  It is worth noting that several articles in the Los Angeles Times and other media outlets have repeated that under the reign of Howard Miller all of Girardi's problems with the Bar effectively ended.  Conversely, it was during that time and shortly before the settlement in the BPA litigation that respondent was suspended from practice. Respondent could not participate in the settlement negotiations with defendants, and surely, as Girardi and the rest of the steering committee knew, would have never agreed to the terms of the settlement.  Nevertheless, in violation of California Law, Respondent's name was later signed electronically and without his consent.

The State Bar of California participated in that fraud, which prevented the respondent from further protecting the children of the world.  Further the racketeering activity of the state bar of California constitutes a fundamental abuse of human rights, and a crime against humanity in violation of international law. See G.

Hackworth, Digest Of International Law 681. See also Blakesley, *A Conceptual Framework for Extradition and Jurisdiction over Extraterritorial Crimes*, Utah L. Rev. 685, 717 (1984).

See importantly, <u>Respublica versus Carlisle</u>, 1 U.S. 35 (1778); <u>Respublica versus Roberts</u>, 1 U.S. 1 U.S. 39 (1778) SUPREME.


## <u>THE ENTIRE STATE BAR ACT IS UNCONSTITUTIONAL</u>


The respondent herein will be moving for an order declaring the entire State Bar Act unconstitutional pursuant to <u>Obergefell v. Hodges</u>, 576 U.S. 644, 135 S.Ct 1732, 192 L.Ed 2d 609 (2015), a decision that either coincidentally or by the hand of God, was written by Justice Anthony Kennedy, the close friend and confidant of Tom Girardi.

"Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law." The fundamental liberties protected by this Clause include most of the rights enumerated in the Bill of Rights. <u>See</u> <u>Duncan v. Louisiana</u>, 391 U. S. 145, 147-149 (1968). In addition these liberties extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs. See, e.g., <u>Eisenstadt v. Baird</u>, 405 U. S. 438, 453 (1972); <u>Griswold v. Connecticut</u>, 381 U. S. 479, 484-486 (1965).

"The identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution. That responsibility, however, "has not been reduced to any formula." <u>Poe v. Ullman</u>, 367 U. S. 497, 542 (1961) (Harlan, J., dissenting).

Rather, it requires courts to exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect. See ibid. That process is guided by many of the same considerations relevant to analysis of other constitutional provisions that set forth broad principles rather than specific requirements. History and tradition guide and discipline this inquiry but do not set its outer boundaries. See <u>Lawrence</u>, <u>supra</u>, at 572. That method respects our history and learns from it without allowing the past alone to rule the present." Hodges, 576 U.S. at 647.

    The fact of the matter is that history and tradition no longer have a role in constitutional analysis, particularly as to the licensing of lawyers. For the most part the practice of law consists of making intellectual arguments and submitting them to a court, an arm of the state or federal government.  The state has no interest in regulating this type of speech. In any other context, it would be barred by First Amendment jurisprudence.  The fact that a state has anything to do with the licensing of lawyers or preventing lawyers from practicing law is essentially the regulation of protected speech.

     "The Court has applied strict scrutiny to content-based laws regulating the noncommercial speech of lawyers, see <u>Reed</u>, <u>supra</u>, at ___ , 135 S.Ct., at 2228, professional fundraisers, see <u>Riley</u>, <u>supra</u>, at 798, 108 S.Ct. 2667, and organizations providing specialized advice on international law, <u>see</u> <u>Holder v. Humanitarian Law Project</u>, 561 U.S. 1, 27-28, 130 S.Ct. 2705, 177 L.Ed.2d 355. And it has stressed the danger of content-based regulations "in the fields of medicine and public health, where information can save lives."

<u>Sorrell v. IMS Health Inc.</u>, 564 U.S. 552, 566, 131 S.Ct. 2653, 180
L.Ed.2d 544. Such dangers are also present in the context of
professional speech, where content-based regulation poses the same
"risk that the Government seeks not to advance a legitimate
regulatory goal, but to suppress unpopular ideas or information,"
<u>Turner Broadcasting System, Inc. v. FCC</u>, 512 U.S. 622, 641, 114 S.Ct.
2445, 129 L.Ed.2d 497. When the government polices the content of
professional speech, it can fail to "`preserve an uninhibited
marketplace of ideas in which truth will ultimately prevail.'"
<u>McCullen v. Coakley</u>, 573 U.S. ___, ___ _ ___, 134 S.Ct. 2518, 2529,
189 L.Ed.2d 502. Professional speech is also a difficult category to
define with precision. <u>See</u> <u>Brown v. Entertainment Merchants Assn</u>.,
564 U.S. 786, 791, 131 S.Ct. 2729, 180 L.Ed.2d 708. If States could
choose the protection that speech receives simply by requiring a
license, they would have a powerful tool to impose "invidious
discrimination of disfavored subjects." <u>Cincinnati v. Discovery
Network, Inc.</u>, 507 U.S. 410, 423, n. 19, 113 S.Ct. 1505, 123 L.Ed.2d
99. Pp. 2373-2375.

"The unlicensed notice unduly burdens protected speech. It is
unnecessary to decide whether Zauderer's standard applies here, for
even under Zauderer, a disclosure requirement cannot be "unjustified
or unduly burdensome." 471 U.S., at 651, 105 S.Ct. 2265. Disclosures
must remedy a harm that is "potentially real not purely
hypothetical," <u>Ibanez v. Florida Dept. of Business and Professional
Regulation, Bd. of Accountancy</u>, 512 U.S. 136, 146, 114 S.Ct. 2084,
129 L.Ed.2d 118, and can extend "no broader than reasonably
necessary," <u>In re R.M. J.</u>, 455 U.S. 191, 203, 102 S.Ct. 929, 71
L.Ed.2d 64. California has not demonstrated any justification for the

unlicensed notice that is more than "purely hypothetical." The only justification put forward by the state legislature was ensuring that pregnant women know when they are receiving medical care from licensed professionals, but California denied that the justification for the law was that women did not know what kind of facility they are entering when they go to a crisis pregnancy center. Even if the State had presented a nonhypothetical justification, the FACT Act unduly burdens protected speech. It imposes a government-scripted, speaker-based disclosure requirement that is wholly disconnected from the State's informational interest. It requires covered facilities to post California's precise notice, no matter what the facilities say on site or in their advertisements. And it covers a curiously narrow subset of speakers: those that primarily provide pregnancy-related services, but not those that provide, e.g., nonprescription birth control. Such speaker-based laws run the risk that "the State has left unburdened those speakers whose messages are in accord with its own views." Sorrell, supra, at 580, 131 S.Ct. 2653. For these reasons, the unlicensed notice does not satisfy Zauderer, assuming that standard applies. Pp. 2376-2378." See National Institute of Family and Life Advocates, dba NILFA v. Becerra, ___U.S.___, 138 S.Ct. 236, ___L.Ed___(2018).

The Fifth Circuit in Vizaline, LLC v. Tracy, 949 F.3d 927, 932 (5th Cir. 2020), has taken the principle much further.

"In dismissing Vizaline's free speech challenge to Mississippi's surveyor-licensing requirements, the district court erred in distinguishing NIFLA. The court distinguished NIFLA on the ground that it did not involve occupational-licensing restrictions, i.e., "restrictions on who may engage in a profession." In the court's

view, occupational-licensing restrictions—like Mississippi's surveyor regulations—restrict only conduct, not speech. The court therefore held that Mississippi's regulations only "incidentally infringed upon" Vizaline's speech because they merely "determin[e] who may engage in certain speech." The court therefore applied no First Amendment scrutiny to the surveyor-licensing requirements.

"This analysis runs afoul of NIFLA. By discarding the professional speech doctrine, NIFLA rejected the proposition that First Amendment protection turns on whether the challenged regulation is part of an occupational-licensing scheme. See 138 S. Ct. at 2375. The Court overruled circuit decisions that had exempted regulations from First Amendment scrutiny merely because they arose from "generally applicable licensing provisions affecting those who practice the profession." Moore-King, 708 F.3d at 569. In other words, application of the now-discarded professional speech doctrine often went hand-in-hand with occupational-licensing regimes. See, e.g., id. at 569-70 (applying doctrine to a "licensing and regulatory regime for fortune tellers"); Bowman, 860 F.2d at 603 (addressing statute governing "licensing and regulating the profession of accountancy in Virginia"). Accordingly, the Court warned that the doctrine gave "the States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement." 138 S. Ct. at 2375 (emphasis added); see also id. (observing that courts applying the professional speech doctrine had held a "profession" means simply that the activity "involves personalized services and requires a professional license from the State" (emphasis added)). The Court thus made clear that First Amendment scrutiny does not turn on whether censored speakers are professionals, licensed or not.

Instead, NIFLA reoriented courts toward the traditional taxonomy that "draw[s] the line between speech and conduct." Id. at 2373; see also, e.g., Sorrell, 564 U.S. at 567, 131 S.Ct. 2653 (explaining that "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech" (citing Rumsfeld v. Forum for Acad. and Inst. Rights, Inc., 547 U.S. 47, 62, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006); R.A.V. v. St. Paul, 505 U.S. 377, 385, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949)))." See, Vizaline v. Tracy, 949 F.3d 927, 932 (5th Cir. 2020).

The State Bar Act in its entirety consists of enumerated provisions that deny the right to practice law or deny the granting of a license.  In all cases the state bar is micro-managing speech in a manner that is in violation of Hodges.  The fundamental rights herein protected are those enumerated in the Bill of Rights, such as freedom of speech, but also the right to practice law in a manner that is central to individual dignity and autonomy and includes intimate choices that define personal identity and beliefs.  The State Bar Act, as written, denies the respondent the right to practice law because it seeks to control all protected speech under the "professional speech doctrine." Thus, the entire State Bar Act must be struck down.

## THE NECESSARY AND PROPER CLAUSE PROVIDES A DERIVATIVE FORM OF RELIEF HEREIN

Respondent contemplates a case of First Impression pursuant to a derivative right that lies within the Necessary and Proper Clause. The state bar has engaged in racketeering activities against the

respondent for a period of ten years or more.  Further the state bar court is clearly a racketeering enterprise pursuant to 18 U.S.C. Sec 1961(4).

"The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, "private attorneys general," dedicated to eliminating racketeering activity. Id., at 187 (citing Malley-Duff, 483 U. S., at 151) (civil RICO specifically has a "further purpose [of] encouraging potential private plaintiffs diligently to investigate"). The provision for treble damages is accordingly justified by the expected benefit of suppressing racketeering activity, an object pursued the sooner the better. It would, accordingly, be strange to provide an unusually long basic limitations period that could only have the effect of postponing whatever public benefit civil RICO might realize." See Rotella v. Wood, 528 U.S. 549, 557-558, 120 S.CT. 1075, 145 L.Ed 2d 1047 (2000).

The state bar gambled that it could get away with a stunt like this, engaging in the most twisted perversity and criminality imaginable against this respondent for over a decade, and it still continues on with no sign of ending.  The respondent has been denied equal protection of the law and due process of law.  The respondent has no right to a jury trial pursuant to the Sixth and Seventh Amendments, while they have used this racketeering enterprise to destroy his life outside of the context of his status as a lawyer. This court should know that one objective of the state bar has been to prevent Mr. Eardley from holding federal office or receiving a federal appointment.

Under these unusual circumstances, the state bar and its functionaries should be denied the benefit of a jury trial, just as

respondent has been denied such right, while enduring the burden of being subject to a court for which the rest of the society is not subject.  In this context, the state bar should be subjected to an expedited proceeding that is consistent with the fulfilment of Congress' objectives. Further the functionaries of the state bar should be subject to a criminal penalty without the benefit of a jury trial and on an expedited basis as well.  See ex parte Yarbrough, 110 U.S. 651 (1884).

In this case, damages are not based upon a presentation that is according to proof.  They are instead based upon the respondent's submission in the form of a "suggestion," and reviewed by the court for their "reasonableness."

The respondent hereby demands as follows:

That respondent's children are to be handed over to him at once;

Actual damages to the respondent are to be calculated per year times eleven;

Punitive damages in an amount of ten times the actual damages per annum;

## PUNATIVE CORRECTIVE ADVERTISING WILL BE REQUIRED HEREIN

Further respondent will submit to the court for its approval a plan for a new species of "punative" corrective advertising, directed at curing the anti-competitive and seditious abuses herein leveled against the respondent. See Warner Lambert v. FTC, 562 F.2d 749 (D. C. Cir 1977); Novartis v. FTC, 223 F. 3d785 (2000).

"This principle, in its application to the Constitution of the United States, more than to almost any other writing, is a necessity,

by reason of the inherent inability to put into words all derivative
powers — a difficulty which the instrument itself recognizes by
conferring on Congress the authority to pass all laws necessary and
proper to carry into execution the powers expressly granted and all
other powers vested in the government or any branch of it by the
Constitution. Article I., sec. 8, clause 18." See ex parte Yarbrough,
110 U.S. 651, 658 (1884).

### UNDER GRABLE, THIS MATTER WAS RIPE FOR REMOVAL

"The classic example is Smith v. Kansas City Title & Trust Co.,
255 U. S. 180 (1921), a suit by a shareholder claiming that the
defendant corporation could not lawfully buy certain bonds of the
National Government because their issuance was unconstitutional.
Although Missouri law provided the cause of action, the Court
recognized federal-question jurisdiction because the principal issue
in the case was the federal constitutionality of the bond issue.
Smith thus held, in a somewhat generous statement of the scope of the
doctrine, that a state-law claim could give rise to federal-question
jurisdiction so long as it "appears from the [complaint] that the
right to relief depends upon the construction or application of
[federal law]." Id., at 199.

"The Smith statement has been subject to some trimming to fit
earlier and later cases recognizing the vitality of the basic
doctrine, but shying away from the expansive view that mere need to
apply federal law in a state-law claim will suffice to open the
"arising under" door. As early as 1912, this Court had confined
federal-question jurisdiction over state-law claims to those that

"really and substantially involv[e] a dispute or controversy respecting the validity, construction or effect of [federal] law." Shulthis v. McDougal, 225 U. S. 561, 569. This limitation was the ancestor of Justice Cardozo's later explanation that a request to exercise federal-question jurisdiction over a state action calls for a "common-sense accommodation of judgment to [the] kaleidoscopic situations" that present a federal issue, in "a selective process which picks the substantial causes out of the web and lays the other ones aside." Gully v. First Nat. Bank in Meridian, 299 U. S. 109, 117-118 (1936). It has in fact become a constant refrain in such cases that federal jurisdiction demands not only a contested federal issue, but a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum. E. g., Chicago v. International College of Surgeons, 522 U. S. 156, 164 (1997); Merrell Dow, supra, at 814, and n. 12; Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for Southern Cal., 463 U. S. 1, 28 (1983)."

Herein, it has taken years for the ugly head of state bar anti-competition to become cognizably visible within the context of federal law.  Now, however, that has resolutely become the case, and this matter may no longer languish within the bowels of state bar court corruption and outright criminality.  Here, removal pursuant to Grable is appropriate, and is further consistent with the constitutional mandate of the Necessary and Proper Clause and all implied rights that derive therefrom.

## CONCLUSION

For the foregoing reasons, respondent Jon J. Eardley hereby appeals the entire matter and further petitions accordingly.

1   Additionally, respondent hereby demands the additional relief as

2   stated herein.

3

4

5

6

7

8                                   Dated this 19th day of October,
                                  2021

9

10                                 Respectfully submitted,

11

12                                            Jon J. Eardley

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF APPEAL AND PETITION - 45

1  Additionally, respondent hereby demands the additional relief as

2  stated herein.

3

4

5

6

7

8                                        Dated this 19th day of October,
                                         2021

9

10                                       Respectfully submitted,

11

12                                                     Jon J. Eardley

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF APPEAL AND PETITION - 45

Additionally, respondent hereby demands the additional relief as stated herein.

Dated this 19th day of October, 2021

Respectfully submitted,

Jon J. Eardley

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NOTICE OF APPEAL AND PETITION - 46